Hon. William H. Hunt, $\left.\right\}$ Associate Justices.
Hon. William T. Pigott,

WORTMAN, Respondent, v. MONTANA CENTRAL RAILWAY CO., Appellant.

[No. 1,000.]

[Submitted January 20, 1899. Decided March 13, 1899.]

*Contracts— Construction—Right to Terminate—Performance Within Specified Time— Waiver—Provisions Ousting Jurisdiction— Validity—Pleading— Variance.*

1. A contract for replacing the wooden walls and arches of a railway tunnel with others authorized the railroad company to stop any of the work, or to diminish the force employed by the contractor, should it be necessary to do so, and required the contractor to stop the work or diminish his force as the railway company's engineer di-

rected. The work was to be prosecuted at such times and at such points as the engineer should direct. Cars for handling the material were to be furnished by the railroad company. Failure of the contractor to comply with the contract was to authorize a cancellation thereof by the company, and if, in the opinion of the company's engineer, the contractor neglected to prosecute the work as fast as required to complete it within the specified time, the company had the right to terminate it, or to employ other parties to complete it; charging the cost thereof to the contractor and deducting it out of the moneys due him. *Held*, that the railroad company had no right to temporarily stop the whole work to be resumed later on.

2. The railroad company did not have the right to arbitrarily cancel the contract without cause, regardless of the rights of the contractor.

3. Under Civil Code 1895, Sec. 2245, providing that provisions of contracts by which controversies thereunder are to be arbitrated without 'the right of appeal to the courts shall be void, a provision of a contract by which the construction to be placed on it by the agent of one of the parties should be final, without the right of appeal to the courts, is void.

4. A provision, in a contract to replace the abutting walls and arches of a railway tunnel with others, that the engineer of the railroad company shall be the judge as to whether the work has been done according to the specifications of the contract therefor, is valid.

5. A building contract was alleged to have been breached by temporarily stopping the contractor from proceeding with the work, and wrongfully refusing to permit him to resume. The evidence was that after the time for its completion the contractor had notified the company he should quit, unless he was paid installments due. A letter to the company stated that he had shut down work because the company refused to make the payments stipulated. The company wrote the contractor to continue work *as per certain instructions, and then stop all work until further notice;* and the answer was that the contractor would obey instructions, reserving his rights. In another letter the contractor stated that he should proceed with the work as ordered, and then stop, unless ordered otherwise; that the company's action was a hardship, the cause of the company's action being his stopping work for one day only, but that, should the company terminate the contract, and pay him the balance due, and allow him a fair valuation for the working plant, he would *have nothing further to claim.* The company answered to stop work as soon as completed, according to previous letters. Another letter of the contractor stated that the company's order to quit bankrupted him; that he desired to continue the work in some other way, if not under the contract. The company answered that when work was resumed on the tunnel, the company might be able to arrange with him for doing the work, but that he should distinctly understand that no promises were made him as to when work would be resumed, or, if resumed, who would do it. *Held*, that the evidence showed a cancellation of the contract by the company for failure of the contractor to complete it within the specified time, and hence there was a fatal variance, even if the cancellation was wrongful.

6. The correspondence between the parties did not amount to an independent agreement to stop work temporarily.

7. A contract for walling and arching a tunnel was to be completed within a specified time, and payments for the work were to be made in installments. If slides occurred in the tunnel during the progress of the work, the contractor was to remove them for a specified compensation. Such slides having occurred, the contractor refused to remove them, claiming that they were not within the terms of the contract; and the railroad company assented, and made an independent agreement with him for their removal, agreeing to pay him a specified compensation. *Held*, that the railroad company's failure to pay him the amount due under the independent contract for their removal was not a breach by the railroad company of the contract to wall and arch the tunnel.

8. In an action for the breach of a contract to wall and arch a railway tunnel, which authorized a cancellation by the company if, in the opinion of its engineer, the work was not properly done, or not done fast enough to complete it within the required time, the complaint alleged that the breach was by the company's engineer temporarily stopping the contractor from working, and then wrongfully refusing to permit

him to resume.· The defense was that the engineer ,had permanently stopped the work, as under the contract he was authorized to do. The court charged that the burden was on the railway company to show that, in the opinion of its engineer, the contractor was either refusing, or was not prosecuting the work with reasonable diligence, and that the jury must.find for the contractor, unless they found that the engineer had formed such opinion, and communicated it to the railway company, and that, though he formed it, the company could not take advantage thereof, unless it was communicated to the company. *Held*, that, in the absence of proof on the subject-matter of the instruction, it was erroneous, as authorizing the jury to infer that the railway company, having failed to establish that it had canceled the contract only after its engineer had formed such opinion and communicated it, had violated the contract.

9. Such charge was erroneous as ignoring the fact that, by claiming that the termination of the contract by the engineer was authorized, the defendant had ratified his acts.

10. The presumption is that a provision of a contract requiring it to be completed within a specified time is waived by the owner permitting the contractor to proceed with the work after the expiration of the time for its completion.

*Appeal from District Court, Lewis and Clarke County; H. R. Buck, Judge.*

ACTION by Daniel P. Wortman against the Montana Central Railway Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

· Statement of the case by the Justice delivering the opinion.

· Action for damages for breach of contract. The contract out of which the action arose, so far as its stipulations and agreements enter into this controversy, is as follows:

"First: The party of the second part (plaintiff), in consideration of the covenants and agreements of the party of the first part (defendant), as hereinafter mentioned, promises and agrees to build abutment walls and arch the tunnel on the line of railway of the party of the first part known as Wickes or Boulder tunnel, and that he will execute and finish such work, in every respect, in the most substantial and workmanlike manner, and to the satisfaction and acceptance of the chief engineer of the party of the first part. ·

"Second: The party of the second part agrees to commence said work on or before the fifth day of May, 1892, and to prosecute the same with such help and means as will, in the opinion of the said chief engineer, insure the completion of the work on or before the first day of August, 1893. That he

will be subject at all times during the progress of said work to the direction of said chief engineer or assistant engineer of said railway company as to the method of doing the work; and that he will conform to the rules and general specifications hereto annexed, and made a part of this agreement.

"Third: The party of the second part also agrees not to assign or transfer this contract, or sublet any of said work, without the written consent of the party of the first part, and that he will at all times superintend the work in person. That he will not employ any man, either as overseer or laborer on said work, who shall have been dismissed from any other work for bad workmanship, intemperance, or disorderly conduct; and that he will, whenever directed by said chief engineer or assistant engineer, dismiss any and every person who is disorderly, intemperate, unfaithful, or unskillful. Said party of the second part also agrees to conform in all respects to the directions of the chief or assistant engineer of the party of the first part relative to said work, and to prosecute the same at such time or times, and in such manner, and at such particular points on the line of said work in said tunnel, as said chief engineer or assistant engineer shall direct.

"Fourth: It is further agreed between the parties that should any difference arise as to the construction of this contract or any provisions of it, or relating to the performance of the contract, such matter of difference shall be decided by said chief engineer, and his decision shall be conclusive as to the matter in dispute.

"Fifth: It is further agreed that if the party of the second part shall, in the opinion of the party of the first part (such opinion being determined by the chief engineer), have failed or shall refuse to comply with any of the provisions of this contract, said first party shall have the right to cancel it, in which event said second party shall have no claim whatever on said first party for damages, compensation, or percentage retained by said first party as hereinafter stated, either for material or work, but said first party shall have a right to take possession of and hold said material and work, and shall

be absolved from any obligation under this contract, as though it had never been made.

"Sixth: It is further mutually agreed that if said second party shall at any time neglect or refuse to prosecute the work as fast as, in the opinion of the chief engineer of the party of the first part, may be necessary for the completion of it by the time specified herein, the first party may declare this contract terminated, and the amount which shall have been retained at the time out of the monthly estimates which have become due up to the time of the termination of said contract shall be forfeited to said first party, or said first party may employ other parties, at its option, to execute and complete its contract, and charge the cost of the same to the said second party, to be deducted out of such retained percentage, or out of any payment that shall have become due on any subsequent estimate.    *    *    *

"Eighth: Parties further agree that whenever, in the opinion of the party of the first part, it may be necessary to stop any of the work, or to diminish the force employed, said first party shall have the right to do so,—such opinion being determined by said chief engineer,—and the party of the second part shall have no claim for damages, but shall stop the work or diminish the force as the first party may direct. It is further agreed that when any work under this contract shall be done by said second party at the request of said chief or assistant engineer, and for which no price is specified in this contract, said second party shall be entitled to a reasonable price, in the same proportion as the work for which prices are stipulated herein.    *    *    *"

Then follow specifications providing for the details of the work, the materials to be used, the mode of doing the work, car service, safety of employes, the disposition of falling material or slides, movement of trains, dimensions of the tunnel, possible changes in form and material, mode and times of payment, and other matters, none of which are material to consider here, except the following:    "*    *    *    In case material falls or slides as aforesaid, party of the first part agrees to al-

low party of the second part fifty cents per cubic yard for removing the same from the tunnel upon cars and unloading near the portals of the tunnel, except when such material shall be hauled away by the railway company. * * * All claims for compensation for removing the material of slides or falls must be made in writing within thirty days after removal of the same. * * *

"Party of the first part agrees that it will furnish motive power and a sufficient number of flat cars for handling material in the prosecution of the work, and that it will at its own expense construct necessary side tracks and switches from its main line near the tunnel to enable it to handle cars and trains and such material in a reasonable and proper manner, and that it will also construct necessary side tracks from its main line at points where party of the second part desires to quarry and obtain rock to be used in filling in, or in the prosecution of the work. * * *

"It is further agreed that estimates may be made from month to month of the work done, and when made, and reported to the party of the first part by said chief engineer, party of the first part agrees to pay party of the second part ninety per cent. of such estimate, in cash, on or about the twenty-fifth day of the month, for all work done and covered by said estimate during the previous month."

The complaint alleges that the plaintiff entered upon the performance of the work provided for in this contract, and continued therein, in accordance with the terms and provisions thereof, and in obedience to the directions of the representatives of the defendant, as in said contract provided; that he kept and performed all the conditions thereof on his part until the breach committed by defendant, in its refusal to allow him to proceed; that in the month of October, 1893, the defendant, through its chief engineer, claiming to act under paragraph 8 of the contract, directed the plaintiff to stop work temporarily, and that in obedience to such direction he did stop the work temporarily; that the defendant has failed and refused ever since to allow him to proceed with the work un-

der the contract and complete it; that by the refusal to allow him to proceed with the work the defendant has violated the contract; that time is not of the essence of the contract; that plaintiff continued to work under the contract, under the direction of the defendant, long after August 1, 1893,—the defendant, with full knowledge of this fact, accepting the work as it progressed, and making payments thereon, in accordance with the conditions of the contract; and that, if he had been allowed to complete the work under the contract, he would have realized thereon a profit of $40,000. Judgment is demanded for this sum.

The answer of defendant denies all these allegations in the complaint, except that it notified plaintiff to stop work in October, 1893. This is admitted, but the defendant denies that it gave such notice under the provisions of the eighth paragraph of the contract. The answer then proceeds to allege various matters affirmatively, to wit: That the contract provides, in terms, that the defendant should have the option to stop the work at any time it saw fit or desired to do so, and that it elected, under the terms of the contract, to stop work and cancel the contract in October, 1893; that plaintiff would not be entitled to any damages in case this was done; and that, therefore, he should not be heard to claim any damages by reason of the stopping of the work.

The answer further alleges that the plaintiff did not perform the work as provided for in the contract, and as directed by the representatives of the company; that he did not conduct the work with reasonable diligence, or with force of men and means sufficient to complete the work by August 1, 1893; that plaintiff on many occasions during the time he was engaged in the work, and down to the time he was stopped by the defendant, voluntarily, for his own purposes, and without the consent of the defendant, stopped work, and for this reason, by his own fault, failed to complete the contract by August 1, 1893; that he was repeatedly notified by the chief engineer of defendant that the work must be completed by the time fixed in the contract; that the said engineer repeatedly notified

plaintiff to increase the number of men and the means employed to finish the work by that time, but that plaintiff, though promising to comply, failed and refused to do so; that the defendant at the time the contract was entered into was engaged in operating its line of railway as a common carrier; that the work to be done by plaintiff would naturally interfere with this business, and that the material inducement to enter into the contract was the undertaking on plaintiff's part to speedily finish the tunnel, all of which was known to plaintiff; that the principal part of the work to be done by plaintiff was to remove the lining of wood then in the tunnel, and replace the same with one of brick or stone; that the wooden timbering in the tunnel was weakened by decay and other causes; that, because the plaintiff failed to complete the work under the contract, a large part of the tunnel was left in a dangerous state, owing to the probable giving away of the timbering, and the falling or sliding of earth and rock, and the consequent obstruction of defendant's business and its duties to the public; that on August 1, 1893, owing to this unsafe condition of the timbering in the parts of the tunnel left incomplete, the defendant could not stop the work and leave these parts unfinished without violating its duties to the public; that defendant permitted the plaintiff to continue work after this for the sole purpose of putting the tunnel in a safe condition, and for no other reason; and that no other work was done under the contract after August 1, 1893, except for this purpose. It further alleges that the plaintiff notified the defendant, in writing, in October, 1893, that he would not be able to proceed with the work until some future day, and thereupon ceased work; that then defendant terminated the contract, with the acquiescence of the plaintiff, through the chief engineer of defendant, whose opinion was that the plaintiff had not prosecuted, and was not at that time prosecuting, the work in accordance with the terms of the contract. It further alleges that, at the time notice was given the plaintiff to cease work, notice was also given to the plaintiff that he would not be permitted to do any more work under the contract;

that it was at that time the opinion of the chief engineer of the company that the company had a right to discontinue the contract; and that the plaintiff thereupon presented to the defendant his excuses for failing to keep the contract according to its terms, and asked that he might be permitted to continue, but that defendant refused, and the plaintiff thereupon consented to the termination of the contract.

A trial was had by a jury, which resulted in a verdict for plaintiff for $15,500. Judgment was entered thereon. From this judgment, and from an order overruling its motion for a new trial, defendant appeals.

*A. J. Shores,* for Appellant.

Citing: *Martinsburg & P. R. Co.* v. *March,* 5 Sup. Ct. Rep. 1035; *Sweeney* v. *United States,* 109 U. S. 618; *Kihlberg* v. *United States,* 97 U. S. 398; *Ogden* v. *United States,* 68 Fed. 725; *Lewis* v. *Chicago S. F. & C. Ry. Co.,* 49 Fed. 708; *Langdon* v. *Northfield,* 42 Minn. 464; *Denver & N. O. C. Co.* v. *Stout,* 5 Pac. 627; *Williams* v. *Chicago S. F. & C. Ry. Co.,* 20 S. W. 637; *O'Donnell* v. *Forrest* (La.) 11 So., p. 245; *Bowman* v. *Stewart* (Pa.) 30 Atl. 988; *Pres. Etc. D. & H. Canal Co.* v. *Pennsylvania Coal Co.,* 50 N. Y. 258; *Hudson et al.* v. *McCartney,* 33 Wis. 340; *Mon. Co.* v. *Fenton,* 4 Watts & Sarg. 205; *Lanman* v. *Young,* 31 Pa. St. 306; *Grant* v. *Savannah Ry. Co.,* 51 Ga. 348; *Gray* v. *Cen. Ry. Co.,* 11 Hun. 70; *Snell* v. *Brown,* 71 Ill. 133; *Territory* v. *Owens,* 3 Mont. 139; *Kelly* v. *Cable Co.,* 7 Mont. 77; *Heilbronner* v. *Lloyd,* 42 Pac. 855; *Territory* v. *Hart,* 7 Mont. 502; *Nixon* v. *Cutting F. Co.,* 42 Pac. 108; *C. B. & Q. Ry.* v. *Anderson* (Neb.) 56 N. W. 794; *Carson* v. *Stevens* (Neb.) 58 N. W. 845; *Goodell* v. *B. C. L. Co.* (Ark.) 21 S. W. 104; *McElvey* v. *C. & O. Ry.* (W. Va.) 14 S. E. 261; *Imhoff* v. *C. & M. Ry.,* 20 Wis. 365.

*McConnell, Clayberg & Gunn,* for Respondent.

Citing: *Utter* v. *Ins. Co.,* 65 Mich. 545; *Friends* v. *For-*

*singer*, 25 N. E. 129; Cooley on Const. Lim., p. 443; note to 8 Am. St. Rep. 921, 922 and 923; *Pearl* v. *Harris*, 124 Mass. 390; *Randall* v. *American Insurance Company*, 10 Mont. 353; *Reed* v. *Washington Insurance Company*, 138 Mass. 535; *German Insurance Company*, v. *Etherton*, 41 N. W. 406; *Baeur* v. *Samson Lodge*, 1 N. E. 575; *Home Insurance Company* v. *Morse*, 20 Wall. 445; *Doyle* v. *Continental Insurance Company*, 94 U. S. 535; *Barron* v. *Burnside*, 121 U. S. 186; *Hancock* v. *Yoden*, 23 N. E. 253; Sutherland on Stat. Constr., Sections 428, 476; *People* v. *Langtree*, 64 Cal. 256-259; *Baltimore Ry. Co.* v. *Scholes*, 56 Am. St. Rep. 312; *Dunn* v. *Stenburg*, 24 N. E. 315; *Davis* v. *Robert*, 18 Am. St. Rep. 126; *Hennessy* v. *Bacon*, 137 U. S. 178; *Robin son* v. *Lake Shore, Etc., R. Co.*, 61 N. W. 1014.

BRANTLY, C. J.—The cause of action stated in the complaint is the temporary suspension of the work by defendant, which it is conceded it had a right to do, its failure to permit plaintiff to resume after the lapse of a reasonable time, and the damage accruing to plaintiff for the wrong thus done. The denials in the answer put in issue these allegations. The answer alleges that the work was stopped by defendant under its option reserved in the contract, to terminate it at any time, and also that the contract was terminated because, in the opinion of the chief engineer, the terms of it had not been observed by the plaintiff. A brief examination of the contract will materially aid us in the investigation of the record, and this we proceed to do before taking up the questions presented for review.

The first and second paragraphs provide for the quality of workmanship to be employed, the time within which the enterprise was to be completed, and the arbitrator to judge both of the quality of the workmanship, and the method and means for its accomplishment.

The third paragraph, after an agreement by plaintiff not to assign the contract or sublet any of the work, and to employ men satisfactory to the chief engineer, then provides that the

work must be prosecuted at such time or times, and at such points, as this arbitrator or referee might direct.

The fifth and sixth paragraphs contain special provisions touching the right of the defendant to stop all work under the contract, and its rights in case this should be done. The former has reference generally to all the conditions of the contract; the latter emphasizes the element of time. The right to terminate the contract entirely for failure of performance of any one of its material stipulations is to be found only in these two provisions, unless it be in paragraph 4, to which reference will be made hereafter. It is clear, also, from an examination of them in the light of the other provisions, that it was the intention of both parties at the time of signing the instrument that the work should be prosecuted continuously to completion, and that it should be completed within the time fixed in the contract. While the chief engineer is named as the arbitrator whose judgment should determine that an exigency had arisen justifying the termination of the contract, yet it is clearly implied that this judgment should be exercised in good faith. There is nothing more in either one of these paragraphs than would be implied in any contract,—so far as concerns the right in either party to terminate it when the other failed or refused to comply with its provisions, except that, as to the matter of time, the engineer could, upon reaching the conclusion that the work was not getting forward fast enough, order an increase of force, and cancel the contract for disobedience. The reservation of the right to cancel in the fifth paragraph clearly has reference to the stipulations of the second paragraph as to means and help, and the period within which performance must be accomplished, while the sixth has reference to the performance of the terms and conditions of the contract generally.

The seventh and ninth paragraphs have been omitted from this discussion, because their provisions are not in controversy here.

The eighth paragraph is the one upon which this action is predicated. Upon his interpretation of the expressions, "stop

any work or diminish the force employed," and "shall stop the work or diminish the force," the plaintiff reaches the conclusion that the defendant had the right to stop the whole enterprise temporarily, to be resumed after a reasonable time under more favorable auspices. Now, while it is competent for parties to incorporate in their contract a stipulation that the enterprise may be stopped temporarily, or even abandoned entirely at the option of either, and while they may stipulate, independently of the contract, for temporary or permanent abandonment of the work during its progress, we do not think this paragraph susceptible of the interpretation given to it by the plaintiff. The reservation is not the right to stop the work or discharge the force, but "to stop *any* of the work or *diminish* the force." Though the words "stop the work" are used in the latter part of the paragraph, yet they have reference, clearly, to the same thing with reference to which the necessity might arise, viz, "to stop *any* [that is, some] of the work or *diminish* the force." This becomes clear when reference is made to the latter part of paragraph 3, wherein it is provided that the work shall be prosecuted "at such time or times, and in such manner, and at such particular points on the line of said work," as the engineer shall direct; bearing in mind, meanwhile, the fact that both parties intended that the enterprise should be prosecuted to completion, and that the tunnel was to be used during the progress of the work. It is to be remembered, also, that the defendant was to furnish car service for plaintiff to enable him to handle his materials. This was to be without expense to plaintiff. Safety in the handling of cars was a matter of prime importance. The business of the company must proceed. Therefore paragraph 8 must have been inserted for the purpose of enabling the defendant company to control the amount of such service, and, to a reasonable extent, the number of men employed, as well as the distribution of the various bodies of the force along the line of the tunnel; otherwise, the contractor could demand so much car service, and so fill up the tunnel by his forces and appliances, as to greatly impede the usual operations of the company to the inconvenience of its patrons.

Turning now to paragraph 4, we find that the engineer is made the final judge of two things,—the construction to be put upon the contract, and the fact of performance by the plaintiff. Differences of opinion between the parties as to both these particulars are to be determined by him, and from this determination there shall be no appeal. It is now the well-settled doctrine, by the great weight of authority, that parties cannot stipulate beforehand to submit their rights generally to the judgment of a designated third person for final determination. The effect of such a stipulation is to oust the courts of their jurisdiction, and to restrict the parties from enforcing their rights under the contract by the usual legal proceedings in the ordinary tribunals. There is some conflict of authority upon this subject in the reported cases, but we do not think the question open to discussion in this state. "The question as to how far courts will be governed by a provision in the contract requiring that controversies arising as to the rights and liabilities of parties thereunder be submitted to arbitration has engaged the profound consideration of both American and English courts of last resort. The conclusion reached, and probably settled beyond further controversy, is that a provision in a contract requiring all differences or controversies arising between the parties as to their rights and liabilities thereunder to be submitted to arbitration will not be allowed to interfere with or bar the litigation of such controversies when brought into court." (*Randall* v. *American Insurance Co.*, 10 Mont. 340, 25 Pac. 953.) The principle stated in this passage has since been enacted in the Civil Code of 1895, and may be found in Section 2245. This section of the Civil Code we hold to be a statement in the form of a statutory enactment of the common law as it existed in this state prior to the adoption of the Codes in 1895. For other authorities supporting this principle, see *Utter* v. *Travelers' Insurance Co.*, 65 Mich. 545; *Reed* v. *Washington Insurance Co.*, 138 Mass. 572; *Noyes* v. *Marsh*, 123 Mass. 286; *German-American Insurance Co.* v. *Etherton*, (Neb.) 41 N. W. 406; *Bauer* v. *Sampson Lodge No. 32, K. of P.*, (Ind. Sup.) 1 N.

E. 571; *Insurance Co.* v. *Morse*, 20 Wall. 445; *Pres. etc. D. & H. Canal Co.* v. *Penn. Coal Co.*, 50 N. Y. 218; *Hancock* v. *Yaden*, (Ind. Sup.) 23 N. E. 253; *Barron* v. *Burnside*, 121 U. S. 186, 7 Sup. Ct. 931; *Supreme Council Order Chosen Friends* v. *Forsinger*, (Ind. Sup.) 25 N. E. 129; Bac. Ben. Soc. Sec. 450; and *B. & O. & C. Railway Co.* v. *Scholes*, (Ind. App.) 43 N. E. 156, 56 Am. St. Rep. 312. This paragraph of the contract is therefore void in so far as it seeks to bind plaintiff to submit without appeal to the construction given by the agent of the company, but valid in so far as it stipulates that the engineer shall be the judge as to whether the specifications of the contract have been complied with by the plaintiff, provided always that this judgment should be exercised honestly and in good faith.

There is much contention in the briefs of counsel touching the validity of this section, but the other stipulations are in this Court assumed to be valid, and we think this assumption correct. We do not find in the contract any ground for the assumption by defendant that it had any option reserved to abandon the enterprise at any time, without reference to the rights of plaintiff. It did not belong to the umpire to construe the contract, and, in the absence of a strained construction, we cannot find this option.

At the close of plaintiff's proof, defendant moved for a nonsuit upon the ground that the proof did not support the allegation of the plaintiff's complaint that the defendant stopped the work temporarily, and wrongfully refused to resume it again. This motion was denied. We think this was error. The proof offered by plaintiff did not tend in any way to support the breach of the contract alleged in the complaint. It failed to show that the defendant intended to suspend the work temporarily, and resume it again after a reasonable time. It tended to show the contrary. It tended to show, and did show, that at the time the work was stopped the defendant intended to stop it permanently, and that the plaintiff so understood it, or should have so understood it. The evidence upon this subject is embraced in a series of letters and telegrams

between plaintiff and N. D. Miller, chief engineer of defendant, bearing date from September 28, 1893, until about the end of the year. . The material parts of this correspondence follow:

Telegram from Wortman to Miller, September 28th: "If you cannot send money due, I shall quit work on tunnel to-morrow night at company's risk."

Letter from Wortman to Miller, October 4th: "I have shut down work on tunnel No. 6, and cannot proceed, for following reasons: You will see from inclosed statement that there is due me about $36,390. My plant at tunnel and quarry is about $27,000, making my resources $63,000. The pressure in money matters is such that, while the money due me from the company is good, I am compelled to pay for my supplies and labor. The money received yesterday, $2,590.-15, will be applied to time checks, leaving nothing for supplies. I owe on account of tunnel work that the company might have to pay about $17,000. What I ask you to do is to forward forthwith my August estimate, and pay for May and June slides, so I can pay for supplies and tunnel work. If you cannot do this, I can go no further with the work until the money comes."

Telegram from Miller to Wortman, October 10th: "Letter of instructions was sent you at Helena on the 5th. Please get it there."

Same from Miller to Wortman, October 12th: "Please do work at tunnel as per my letter to you and J. C. Patterson of the 5th, and then stop all work until further notice."

Same from Wortman to Miller, October 9th: "Have not received your letter of the 5th or any other letter regarding work at tunnel 6. I shall obey your instructions regarding this work if I can. Please wire at Portal."

Same from Wortman to Miller, October 12th: "Will work as per instructions to J. C. Patterson and myself of 5th, reserving my rights in the matter."

Letter from Wortman to Miller, October 11th: "Your letter of October 5th I found in Helena last night when I came

home from quarry.   As I have written you, I shall proceed
with work as you have ordered, and then stop the work, un-
less you order otherwise.   This action on your part will work
a hardship on me that I cannot recover from.   The cause for
your action, as per your letter, is stopping the work the last
time for one day.   On that day I distributed stone at bridges
for culverts; the one time only before, the tunnel engine
needed repairs, and was out to Helena for that purpose.''
After recounting his efforts to do the work to the satisfaction
of E. R. McNeill, the assistant engineer of defendant, the un-
expected outlays made by plaintiff, and other matters, the
letter then proceeds:   ''However, should you deem it just and
right to terminate the contract, and pay me moneys that may
be due, and the 10 per cent. retention, and allow me a fair
valuation for my plant at tunnel and my quarries, I suppose I
can have nothing further to claim.   *   *   *   Hoping you
will reconsider your last decision, and allow me to proceed
with this tunnel work, I await your reply to this letter.''

Letter from Miller to Wortman, October 14th:   ''In answer
to your letter of the 11th, would say that this company can-
not at the present time stand the additional expense that it is
put to on account of your not completing your contract on
time, as it costs this company over $60 per day for every day
that you are working at the tunnel, and as it would probably
take you about a year more than your contract time to com-
plete the work, thus putting this company to an additional ex-
pense of about $25,000 or more, and at the present time we
do not feel that we could incur this additional expense.   *
*   *

''But the main question now is about the stoppage of the
work.   The company does not feel that they should go on
with this increased expense at the present time, and you will
please stop work as soon as you have it all completed, accord-
ing to my previous letters.''

Letter from Wortman to Miller, October —:   ''I shall
probably finish work at tunnel 6 about the 20th of this month,
as per your letter of instructions.

"I desire respectfully to call your attention to some facts in regard to this work, to show you that I have diligently prosecuted this work to the exclusion of everything else. I have invested all I had, borrowed all I could,—about twenty-seven thousand dollars,—in good faith, believing I should finish the work, enabling me to pay for plants I bought on account of this work. But your order to quit makes it impossible for me to pay my debts, and leaves me a pauper. As I told you in St. Paul, this is bitter medicine. I shall take it as best I can, but desire to ask you if this is right treatment, as between your company and myself. * * *

"If your company, through you, its chief engineer, shall terminate the contract, and by its action pauperize me, I suppose I shall have to suffer it, but shall do so knowing that I have honestly, industriously and continuously prosecuted this work at all times under the immediate supervision of E. R. McNeill, engineer in charge. I desire, if it is possible for you to do so, to continue this work, if not under the present contract, some other way, or employ me in some way so I can at least pay the debts incurred by me for this work, or fix a time in the near future that I may proceed with work. I hope you will pardon me for writing so long a letter. Please answer as may seem best to you for all parties."

Letter from Miller to Wortman, November 24th: "I received a letter from you a few days ago, without date; and, from the tone of the letter, it would seem that you think you have not been treated fairly in respect to your work at tunnel 6. I do not think that you have any just cause for complaint in relation to this work, as far as I am concerned, as you will recollect, when the work was first turned over to me, I wrote you, urging you to put on more men, and complete the work on contract time. I think you could have very nearly done this, if you had tried. You say in your letter that Mr. Beckler wanted good material and labor. This was especially provided for in the contract, and I do not think the labor or material is anything better than provided for in the contract.

"In relation to buying the contractor's outfit, of course

that is something that the company had nothing to do with, and you were supposed to know more about it than they were at the time you bought it. The same in relation to the quarry. * * *

"If anything should come up whereby the work is allowed to go on, I shall be glad to communicate with you in relation to the same."

Letter from Miller to Wortman, December 31st: "In relation to the completion of the lining of the Wickes tunnel, or tunnel No. 6, or any further work in relation to the said lining, would say I cannot make any promises at the present time as to when work will be resumed again, or upon what terms. I think, however, that when work is resumed we shall be able to make an agreement with you to do the work; but I would suggest that you put your tools at the quarry and at the tunnel in good shape where they are. We may possibly commence work again next summer; but I wish you to *distinctly understand* that I make no *promises* as to when the work will be commenced, or who will do it when it is commenced.

"The railway company does not wish to purchase any cement or brick at the present time, but, however, I wish you would write me what you can sell same for at Helena or Butte."

Letter from Wortman to Miller, January 9th: "Replying to your letter of December 31st, will say that I shall act on your suggestion, and put tools and appliances for getting out rock and tunnel lining in good shape where they are, and hold myself in readiness to resume work on tunnel No. 6, or to do any other work you may desire in the future. I hope you can put me to work soon. There is no sale for brick at present, and Louisville cement is not used here, that I know of. Cement is stored in a good house at tunnel, and will be kept dry. Sixty thousand brick I unloaded at tunnel; two cars are in yard at Helena. Brick and cement can be used in culverts when they are finished. As my two sons and myself will have to be at tunnel and quarry more or less this winter, will you

kindly direct passes issued for Daniel P. Wortman, Great Falls to Anaconda; George Wortman, Great Falls to Anaconda; and William Wortman, Helena to Basin.''

In addition to these communications, there were several others introduced, bearing date from January 1, 1895, to April 5, 1895, containing inquiries from Wortman as to when work would be resumed at the tunnel, and propositions to do other work in case there was no intention on the part of defendant to complete the tunnel. This correspondence also shows that the defendant, through its chief engineer, notified plaintiff on March 18, 1895, that he could resume work long enough to complete 500 feet more of the tunnel, but that re-. spondent refused to begin, except under a different contract, claiming that the defendant had violated the original contract. He was subsequently informed by the chief engineer that he had given this notice through a misconception of the facts, because upon an examination of all the correspondence of the year before, he found that the original contract had been canceled. This engineer was the successor to Miller, the engineer in charge at the time the contract was made.

This is all the proof on the subject of the stoppage of the work at the tunnel, except that plaintiff says he knew the contents of the letter of October 5th, referred to in the foregoing correspondence, and that the correspondence after that date had reference to the orders contained in it. This letter was not introduced in evidence, because plaintiff denied, when it was offered, that he had ever seen it. It is fair to infer from an examination of the communications which passed between the parties after October 4th that the plaintiff was, in the letter of the 5th, notified that his contract was terminated, and that he so understood it. It is also clear that the reason alleged on the part of defendant was that plaintiff had failed to finish the work by the time named in the contract. If any conclusion is to be gathered from this correspondence, this must be the correct one, else the plaintiff would not have used the expressions he does in these letters as to the hardship resulting to him from a cancellation of the contract after he was

in such good shape to complete it. Neither would he have made an effort to sell his supplies and his machinery and quarry. If any doubt was left in his mind at all as to the intention of the company, surely this was set at rest, or should have been, by the language of the chief engineer in the letter of December 31, 1893, where he says: ''We may possibly commence work again next summer; but I wish you to distinctly understand that I make no promises as to when the work will be commenced, or who will do it when it is commenced.'' To the same effect is the last paragraph of the letter written by Miller to plaintiff on October 14th. The use of the expressions, ''until further notice,'' and ''at the present time,'' frequently occurring in the correspondence, cannot, in the face of the other facts and statements appearing therein, be construed to mean that the defendant was attempting to stop the work temporarily, under any clause of the contract; for we have seen that the contract contains no provision empowering it to do so. Nor can they, with the other statements in the correspondence, be interpreted as a stipulation, independently of the contract, to stop the work temporarily. This correspondence, together with the other evidence of the plaintiff, all of which we have examined with the greatest care, tends to show, if anything at all, that the defendant wrongfully canceled the contract, and thereby damaged plaintiff, — an entirely different cause of action from that alleged in the complaint. The motion for nonsuit properly presented the question, and it was incumbent upon the court to interpret this evidence. This was the office of the court in any event, for it was a matter of intention of the parties as expressed in these writings, and this intention was for the court, and not for the jury, to determine; and it seems to us that it is impossible to reach any other conclusion than the one we have reached.

Nor does the proof introduced on the part of defendant aid the plaintiff's case. An issue is made in the pleadings upon the plaintiff's cause of action, and the defendant maintained its position there assumed throughout. It maintains its posi-

tion in this Court. Nor can it be contended successfully that the variance is an immaterial one. The plaintiff is seeking to recover on a cause of action accruing from an alleged wrong for an act of defendant long after October 5, 1893, while his proof tends to establish another breach of the contract for another wrongful act at that time. If the question had not been raised during the trial in the lower court, we should hold that the defendant could not now complain, but it preserved its rights, and we do not feel that we can properly ignore the question as presented here, and treat the case as if the pleadings had been properly amended at the trial so as to cure the substantial variance. This is not a new question in this Court. (*Childs* v. *Ptomey*, 17 Mont. 502, 43 Pac. 714; *Newell* v. *Nicholson*, 17 Mont. 389, 43 Pac. 180; *Maul* v. *Schultz*, 19 Mont. 335, 48 Pac. 626.) In the case of *Maul* v. *Schultz*, *supra*, this Court said: "He (plaintiff) cannot be permitted to mend his hold after litigation has begun, change his ground, and upon new aspects of the case shift his position from that taken and relied on before the court." Upon another trial of the cause totally different aspects may be presented by the proofs, and the results may be different.

But, apart from this aspect of the case, we do not think the verdict can be sustained. Under the allegations of the answer, the defendant undertook to establish the fact that it canceled the contract in October, 1893, because the work was not completed by August 1, 1893, as in the contract provided. The plaintiff, in rebuttal, endeavored to show that his failure in this regard was due to the failure on the part of defendant to pay moneys due from time to time for work done, according to the monthly estimates. Proof was offered to show that slides occurred in the tunnel during the months of May and June, 1893, which had been removed by plaintiff, and that the pay due for this work, amounting to about $1,500, had been withheld for several months, to the great embarrassment and delay of plaintiff. The contract provided for the removal of such slides, but, when these of May and June occurred, they were of such dimensions that the plaintiff refused to re-

move them under the contract; claiming that the contract did not cover them, and that such were not contemplated at the time the contract was signed.    The defendant finally agreed that they were not covered by the contract, and further agreed to pay for their removal independently of the contract, and at a better price per yard.    This proof was admitted over the objection of defendant.    This was error.    The failure to pay this sum under the provision of the contract (that is, on or before the 25th of the month following the one in which the work was done) was in no sense of the word a violation of the contract on the part of defendant under the issues as made up by the pleadings; it had nothing more to do with the fulfill-ment of the contract by defendant than the failure of any other person to pay plaintiff what was due him.    Besides, the proof having already shown that plaintiff refused to construe the contract so as to cover these slides, and that his construc-tion had been conceded by defendant, he should not have been allowed to allege the failure on the part of defendant to pay for them under the contract as a breach of duty in defendant.

The instructions are in material respects erroneous.    The plaintiff alleges that the defendant stopped the work tempo-rarily through the chief engineer.    The defendant admits that it stopped the work, but says the stoppage was permanent, and not temporary.    There is therefore no issue made as to the authority of the engineer to perform the particular act.    The issue is as to the nature of this act.    The court undertook to instruct the jury fully as to how the engineer should get his authority to stop the work, and the mode in which he should exercise it.    For example, the charge of the court in para-graphs 6 and 9 was as follows:

"(6)    The burden is upon the defendant to show by a pre-ponderance of the evidence that, in the opinion of the chief engineer, plaintiff either refused to prosecute, or was not prosecuting, the work with reasonable diligence, before you can find that the defendant had the right to terminate said contract under the terms thereof.    Unless you find some fact sufficient to justify your minds that the chief engineer had

formed such an opinion, and that he communicated such opinion to the defendant, you must find that no such opinion existed, and that, therefore, defendant had no right to terminate the contract under the terms thereof.''

"(9) Under the contract the chief engineer was not given the right to terminate the same without an opinion, but only to form an opinion as to whether the plaintiff was prosecuting the work in accordance with the terms and provisions of the contract. If he formed such an opinion, the defendant could not take advantage thereof until said opinion had been communicated to it. If defendant, after such communication, if there was any, then desired to terminate said contract, the law would require such desire to be expressed to the plaintiff by a notice in accordance with these instructions.''

These instructions were neither necessary nor proper. Under the allegations in its answer, the defendant assumed responsibility for all the engineer had done in the premises; for it is alleged distinctly that the contract was canceled because the work was not done in time. The only question for the jury to determine in this connection was whether this action of the defendant was justifiable. There was no proof upon the subject to which the latter part of instruction 6 and the whole of instruction 9 refer. They therefore required the jury to embark in a blind speculation as to the mental processes of the engineer, and the course of his communications with his principal; and in this connection they might conclude properly that they should consider the mode of these communications, and the circumstances of time and place in relation to them. They were also left to infer, in the absence of proof, that the defendant, having failed to sustain the burden thus cast upon it, to establish the matters referred to and assumed in these paragraphs to be material, was therefore at fault, and should be held to have violated the contract. These paragraphs also ignore the fact that the defendant had ratified the action of the engineer. This part of the charge was therefore confusing and misleading in its submission to the jury of matters foreign to the issues.

The jury were also instructed that, if they found from the proof that the defendant permitted the plaintiff to continue work after August 1, 1893, in the same general manner as before that time, without notifying plaintiff that it intended to insist upon any delays or violations of the contract prior to that date, and cancel the contract because thereof, and without any agreement or understanding on the part of plaintiff that he should do certain work, and then stop, the defendant thereby waived any right to cancel the contract for anything plaintiff may have done or omitted to dó prior to August 1, 1893. This instruction is assigned as error. Under the facts, we think it correct. Defendant certainly had the right to waive any breach of the contract on the part of plaintiff,—the covenant relating to time as well as any other. If he was allowed to continue work under the contract after a brench, or after the date at which the work should have been completed, then the presumption would arise that such breach was waived by defendant, and that it intended that plaintiff should have a reasonable time after the date fixed in the contract to complete the work.

Many other errors are assigned in the record, but the views we have already expressed are sufficient to guide the court below in a retrial of the cause, if the plaintiff desires to amend his pleadings in conformity with the suggestions made herein.

Let the judgment be reversed, and the cause remanded, with directions to grant a new trial.

*Reversed and remanded.*

HUNT and PIGOTT, JJ., concur.