HARPER'S ADMINISTRATOR, Plaintiff in Error, *vs.* THE PHŒNIX INSURANCE Co., Defendant in Error.

1. A life policy contained a condition, by which it was avoided if the assured should die in the known violation of a law of the state. *Held* that, under this clause, the policy would not be avoided, if the assured was killed after retreating from an altercation which he had commenced, under circumstances which would make the slayer guilty of felonious homicide.

*Error to St. Louis Court of Common Pleas.*

*S. M. Breckenridge,* (with whom *Glover & Richardson* were associated,) for plaintiff in error. The facts stated in the agreed case do not support the judgment. It clearly appears that Harper, when he was killed, had thrown away his pistol, and retreated from the combat. He was not then en-

Harper's Adm'r *v.* Phœnix Insurance Co.

gaged in the violation of any law. It is true that he held "a billet of wood over his head in a threatening position." But there was no attempt to execute the threat, and if there had been, Coryell was in a position which afforded him entire security. He could have had no such reasonable apprehension of danger, as justified him in taking life. It may be said that Harper's death occurred in consequence of his own act in commencing the quarrel, and he was therefore constructively violating the law at the time of his death. It is a settled rule in the construction of policies, that words used in them shall be taken most strongly against the insurer. It is submitted that this construction requires the defendant to show that Harper's death was the direct result of a violation of law—that he was acting in violation of law at the moment of his death, and not merely that his death was the remote result of some prior violation of law. Many deaths may, and doubtless do occur, which result remotely from some long prior violation of some one of our laws. For illustration, A. keeps an unlicensed dram-shop, which B. enters, and after drinking, becomes intoxicated, and without provocation kills A. Would such a case afford a good defence to a policy similar to the one in question? The fact that Coryell killed Harper under an apprehension of danger, although it might palliate his guilt or even justify him, in a prosecution against *him*, cannot avail the defendant in this action, if there was, in fact, no danger. If A. presents a gun, which he knows to be empty, and threatens to shoot B., who supposes the gun to be loaded, B. may be justifiable in killing A.; but A.'s act would hardly avoid a policy upon his life similar to the one under consideration.

*Barton Bates* and *T. B. Hudson*, for defendant in error. The issue to be tried was, whether Harper died in the known violation of the law. The case agreed, it is submitted, shows that he did so die. Harper commenced the assault, and there having been no intermission in the conflict, he was still violating the law when he was killed. At the very moment he received the fatal shot, he was in the act of assaulting Coryell.

It is fair to assume, that the breaches of law which should avoid the policy were intended to be such as enhanced the risk assumed by the company. If the violation of law did not, in any way, endanger life, it would hardly be considered within the meaning of the policy. But where, as in this case, the violation of law was such as tended directly and immediately to enhance the risk, it should certainly have the effect to avoid the policy, according to its express words. Harper's death was occasioned by his own assault upon Coryell, and it matters not what Coryell's guilt or innocence may be.

Scott, Judge, delivered the opinion of the court.

Edmund Harper, on the 17th of December, 1849, took from the Phœnix Insurance Company a policy of insurance on his life, for the term of five years, for three thousand dollars. The policy was subject to the following conditions : "That if the said Harper shall die in consequence of a duel, or by the hands of justice, or in the known violation of any law of this state, then, in such case, the policy shall be void."

This is an action on the policy by the plaintiff, Woodyard, who is the administrator of Harper.

The answer sets up the defence that Harper died in the known violation of a law of this state, in committing an assault upon one Coryell, whereby the policy was avoided ; that Harper, just before his death, assaulted Coryell with a pistol, and attempted to shoot him, who, in resisting said attempt, and in defence of his life, shot and immediately killed Harper.

The trial of the cause was submitted to the court without a jury, and the facts were agreed as follows : On the 6th day of February, 1850, and in the year, within the time for which the life of said Edmund Harper was insured, one Coryell was talking to a man named Wilson, standing about forty paces from B. Harper's store, where the said Edmund Harper, the deceased, then was. The deceased spoke to the said Wilson, and asked him if he knew to whom he was speaking, and admonished him

to keep his hand on his pocket. Coryell then approached the deceased, and inquired if that insult was intended for him. The deceased replied that it was. The parties quarrelled, the deceased drew a pistol with a single barrel, and snapped it at Coryell, who, thereupon, drew a revolver and advanced upon the deceased, standing on the sill of B. Harper's store door, who threw his pistol, which had missed fire, and struck Coryell. The deceased then stepped into the store of B. Harper, and said Coryell, standing in the door of said store, with his revolver, shot at and missed said deceased, who was inside the store, and eight or ten feet from the door. The deceased then retreated precipitately behind an offset formed by a stairway, six or eight feet, and picked up a stick of wood, and raised it in a threatening position over his head, but did not advance upon said Coryell, nor attempt to use said stick in any other manner. Coryell then fired again with his revolver, and shot the deceased through his body, of which he died in a few minutes. The whole difficulty was one continuous quarrel.

Upon these facts, the court found for the defendant, whereupon the plaintiff sued out this writ of error.

1. In the construction of the contract which has given rise to this controversy, we are not authorized to be influenced by any considerations affecting the preservation of the peace and order of society, or of the morals of the party insured. Whilst the law will not countenance contracts against its policy, it does not look for a support to itself in the stipulations of men. In life policies, the insurer has a guaranty against increasing the risk insured, by that love of life which nature has implanted in every creature. In such policies, unless it is otherwise stipulated, the insurer takes the subject insured, with his flesh, blood and passions. The dangers to which the lives of men are exposed from sudden ebullitions of feeling, are a lawful matter of insurance.

When this cause was formerly here, the idea intended to be conveyed in the opinion given was, that a person could not be said to have died in the known violation of a law of this state,

when a crime attached to the individual by whom he was slain. It was not supposed that, therefore, it followed that, in all cases, when the killing was without crime, that the person slain died in the known violation of the law. We see no reason to change the opinion then hazarded. Although conditions in policies, similar to that now under consideration, are not unusual, we have not been enabled to find any case in which its interpretation has come up for adjudication. We must, then, as in all other cases involving the construction of contracts, look to the intent of the parties, as gathered from the instrument embodying their minds. It is obvious that, in giving the words of the condition a literal meaning, cases will be embraced, which no one will maintain were in the contemplation of the parties. If the person whose life is insured, uses offensive language to one, whilst they arc engaged in an unlawful game of chance, which language is concerning the game, and he is shot down for the provocation, it would not be maintained that he died in the known violation of a law of the land, within the meaning of the contract. So, if he is riding a race in a public highway, which is forbidden, and his horse falls and he is thrown, and his neck broken, he does not die in the known violation of a law of the land, within the meaning of the terms of the condition. So, also, in a quarrel, if he assaults another with his open hand, and is thereupon instantly shot down, he does not die in the known violation of a law, within the intent of the policy. Many similar instances might be put, which, it is clear, were not within the meaning of the parties, and if they were, the contract would be much narrowed in its operation. If, then, the literal sense of the words of the policy leads to conclusions which are inadmissible, we are necessarily driven to some other mode, in order to ascertain the meaning of the parties. In the interpretation of contracts of insurance, the maxim *noscitur a sociis* obtains. When a clause stands with others, its sense may be gathered from those which immediately precede and follow it. The clause in the policy, which immediately goes before that under consideration, is, " if the party shall

die by the hands of justice." Now do not these words clearly indicate the idea in the minds of the parties at the time ? Do they not show that it was a justifiable killing ? There are other modes of killing justifiable, than by the hands of justice. Dying by the hands of justice means dying by the execution of the sentence of the law. The fourth section of the second article of the act concerning crimes and punishments, enumerates many instances of justifiable homicide. These are, in resisting any attempt to murder, or to commit any felony on the person or in a dwelling house ; in a lawful defence of a person, when there is reasonable cause to apprehend a design to commit a felony ; when necessarily committed, in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot or insurrection, or in lawfully keeping or preserving the peace. Here are abundant instances in which the words of the condition can have play, without resorting to a latitude of construction, which so extends its sense as to embrace cases which were never in the contemplation of the parties. As there was but one mode of justifiable killing expressed, it was necessary to use general words to include all other modes of such killing, as they were equally within the meaning of the contract. The other clause in the condition is, that if the party shall die in consequence of a duel. If a man falls in a duel, his slayer is guilty of murder. A duel is a deliberate act, and the parties voluntarily, in violation of law, expose themselves to death. The kindred clauses of the condition thus show that a dying in consequence of a felony, then in the very act or course of being committed by the insured, and a dying in consequence of a felony previously committed by him, were in the contemplation of the parties. Now it would seem that, upon the acknowledged rule of construction, *noscitur a sociis*, that the last clause in the condition, being left in doubt as to its meaning, should be construed only to extend to instances in which the party died in the commission of a felony.

It has been shown, that a literal interpretation of this clause would embrace cases not within the intention of the parties; now, the words of the condition are the words, not of the assured, but of the insurers, introduced by themselves, for the purpose of their own exemption and protection from liability; both in reason and justice therefore, no less than upon acknowledged principles of legal construction, they are to be taken most strongly against those that speak the words, and most favorably for the other party; for it is no more than just that, if the words are ambiguous, he whose meaning they are intended to express, and not the other party, should suffer by the ambiguity. 5 M. & G.

The facts of this case clearly show that the person slaying Harper was guilty of a crime. There is no proof of the fact set up as a bar that Coryell slew Harper in self defence. Harper had abandoned the conflict, retreated as far as possible, and endeavored to screen himself from the attack of his assailant. His having a stick of wood in his hand at the time he was slain, did not, in the least, extenuate the guilt of Coryell. Under the circumstances, Harper would have been justified had he slain Coryell. This is made so by our statute. He would have been excused by the common law. If A., upon a suddden quarrel, assaults B. first, and upon B.'s returning the assault, A. really and *bona fide* flees, and being driven to the wall, turns again upon B. and kills him, this is *se defendendo*. 1 Hale, 480. Foster, 273. By the twelfth section of the second article of the act concerning crimes and punishments, it is enacted, that every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony or do any other unlawful act, after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree. Now, if one dies under circumstances which would justify him in slaying his adversary, and when the person causing his death is, thereby, guilty of a felony, is it not a gross perversion of language

to say, that that person died in the known violation of a law of the land? Judge Ryland concurring, the judgment will be reversed, and a judgment entered here on the facts found. Judge Gamble did not sit in this cause.