GRESHAM *v.* EQUITABLE ACCIDENT INSURANCE COMPANY.

| 87 | 497 |
| 107 | 589 |
| 87 | 497 |
| 125 | 583 |
| 87 | 497 |
| e129 | 201 |

If both parties engage willingly in a personal rencounter, it is a mutual combat or fight, and death resulting therefrom is not included in a policy of accident insurance which excepts from the risk death or injury which may have been caused by fighting. It makes no difference, in such case, whether the slayer was sane or insane.

July 13, 1891.

Insurance. Insanity. Nonsuit. Before Judge MARSHALL J. CLARKE. Fulton superior court. September term, 1890.

Reported in the decision.

BROYLES & SONS, J. D. CUNNINGHAM and J. A. AUSTIN, for plaintiff.

CANDLER & THOMSON, for defendant.

BLECKLEY, Chief Justice.

The policy covered bodily injuries inflicted by external, violent and accidental means. It excepted, however, various classes of accidental injuries which might be embraced in these general terms, among them those caused by duelling, fighting, wrestling, etc.; and those happening in consequence of voluntary exposure to unnecessary danger, hazard or perilous adventure, or while engaged in, or in consequence of, any unlawful act; and all injuries the result of design, either on the part of the claimant or any other person. It may be conceded that the homicide was accidental within the meaning of the policy as such policies have generally been construed by the courts. Ripley *v.* Rwy. Co., 2 Bigelow's Life and A. Cases, 738; Hutchcraft *v.* Trav. Ins. Co., 87 Ky. 300, 18 Ins. Law Jour. 317; Phelan *v.* Trav. Ins. Co., 38 Mo. Ap. 640; Richards *v.* Trav. Ins. Co. (Cal., May, 1891), 26 Pac. Rep. 762; Supreme Council *v.* Garrigus, 104 Ind. 133, 54 Am. Rep, 298; Notes to Paul *v.* Trav. Ins. Co., 8 Am. St. Rep. 763; Bliss on Life Ins. §§396, 397; 5 Lawson, R. R., & P. §2140 *et seq.;* 1 Am & Eng. Ency. Law, 87 *et seq.;* 7 Am. Law Rev. 585; same article, 8 Alb. Law J. 85. It may be conceded also that, though the killing was manifestly willful on the part of the slayer, it was open to question whether it was the result of design, that is of rational design, inasmuch as there was some evidence tending to show that the slayer might have been in-

sane. It may likewise be conceded that had the case turned alone on the question whether, at the time the insured was shot, he was engaged in an unlawful act, there was some evidence for consideration by the jury. The evidence as a whole might warrant a negative finding on this point, according to some of the authorities, though not so, perhaps, according to the spirit of others. Cluff v. Mut. Ben. Ins. Co., 14 Allen, 308; Bradley v. Mut. Ben. Ins. Co., 45 N. Y. 422; Harper v. Phœnix Ins. Co., 19 Mo. 506; Trav. Ins. Co. v. Seaver, 19 Wall. 532; Bloom v. Ins. Co., 97 Ind. 478, 49 Am. Rep. 469. But, if the view we entertain of the law is correct, the matter on which after close study there could be no two opinions, no reasonable doubt in impartial and intelligent minds, is that the injury which resulted in death was caused by fighting. Shooting caused the injury, and fighting caused the shooting. The cause of the cause was the real cause of the event. Fighting may cause death by causing a contemporaneous act which causes death. In such case the first causal agency is not too remote though the event be related to it only in the second degree of lineal descent. It is not every fight, however, in or from which a mortal injury might be received by the insured, which could be regarded as the cause of the injury or of death resulting therefrom. A faultless and unwilling conflict by the insured, one which he neither provoked nor invited, one which he did not accept when formally or informally tendered, one in which he was forced to engage for self-defence alone and from which he withdrew, or endeavored in good faith to withdraw, when his defence was accomplished, ought not to, and would not, be treated as a causative fight on his part within the meaning and intent of the policy, but would be regarded as right and proper resistance to aggressive or offensive violence. To protect his life from destruction or his

person from injury might be as much a matter of duty to the insurance company as of interest to himself. Means of resistance which it would be reasonable for him to employ for his own safety, he could not be excused for neglecting, if an efficient use of them were shown to be within his power. It would be no objection to their use that they involved "fighting back" in order to repel the violence of an assailant. The stipulation against liability for injuries caused by fighting refers to voluntary fighting by the insured, or involuntary fighting brought on wholly or partially by his fault or temerity—fighting for which he is partly responsible either as a volunteer or as a rash speaker or a wrong-doer. It could not be the purpose of the stipulation to cut off the right of self-defence by the use of force— the right to repel violence with violence of like nature. The exercise of this right might be mutually beneficial to both of the contracting parties; and that either of them had any purpose to restrict a fair and reasonable exercise of it, is in the highest degree improbable. In order to attribute to the insured anything caused by the fight, he must have had some voluntary agency in caus-ing the fight itself. If he had such agency, if by im-proper speech or voluntary conduct he was a material factor in bringing on the fight, he was, as between himself or his wife and the insurance company, charge-able with the consequences. If the fight was the cause of the mortal injury, and he was the cause of the fight, whether in whole or in part, he was, to that extent, the cause of his own death. If he begat the fight, and the fight begat the shooting, and the shoot-ing begat the injury, he bore an ancestral relation to the last offspring as well as to the first. At all events, being father to the fight, neither he nor his wife, under the terms of this policy, could profit by the fight or by what it brought forth. That, according to the evidence

in this case, there was a fight, admits of no possible question. There was hostile contact, physical collision, an attempt by each combatant to hurt the other; blows were given by one, which took effect, strokes were made by the other, which missed their aim. The origin of the fight is equally manifest. It was not born of the passion of one of the parties, but of a conjunction of the passions of both. It proceeded from an altercation in which each party used rash and insulting language, language calculated to excite anger and provoke conflict. Both being in the same room but some distance—say 20 feet, apart, the other party spoke abusively of secret societies and their members, referring to them in general terms, no particular society or member (so far as appears) being mentioned. This speech was made in the hearing of the insured and several others, but was not addressed to him. Some of the others who were nearer to the speaker remonstrated with him upon the impropriety of his animadversions. Shortly afterwards, as the speaker was passing by the insured on his way out, the latter, without rising from his seat, said to him mildly, in a tone of mortified resentment, "I heard all you said about secret societies, that no gentleman would belong to a secret society." The other answered, "Yes, I said it, and by G—d it is true. Do you want to take it up?" The insured replied, "Well, it's a lie," or "a damned lie," adding, "Yes, I do." Then followed a blow from one of them, probably the former, and the latter "stumbled off his seat," possibly as the result of receiving the blow. They backed towards one of the entrances to the room, several feet, and the insured was stricken by his antagonist several times with a small walking cane, which was broken over his shoulders. The insured struck back with his hands without effect, several of his blows missing their aim. Then, while the other maintained

his position close to where the fight took place, the insured moved back ten or twelve feet to the seat which he had occupied, and looked for and inquired after his hat, which had fallen or been knocked from his head. The other combatant, without changing his position, then drew a pistol and fired the fatal shot. Before anything above referred to was said or done, the parties were aware of each other's presence in the room; they had spoken together in a friendly way, each calling the other by his first, or Christian, name. In substance, this is the whole story of the quarrel, the fight and the homicide, as told by the testimony. The first insult came from the slayer, attended with a challenge to fight. The question, "Do you want to take it up?" propounded in anger, does not, according to the common understanding of it in Georgia, import a proposal to debate or discuss, but a challenge to the arbitrament of force, or a trial of the issue by the personal prowess of the disputants. It is the end, not the beginning of argument. It is no less significant of defiance than was the ceremony of throwing down the glove as a preliminary to trial by battle. The insult was returned by the insured by responding in words of foul opprobrium—words so irritating that gentlemen rarely address them to their equals, except when they intend to back them with their courage; and to make the intent clear in this instance, the challenge was accepted in the superadded phrase, "Yes, I do." Instantly, active hostilities commenced, each party having thus declared his willingness to champion his side of the trivial and needless quarrel. Had not both of them acted with hot-headed rashness in passing insults, there would have been no fight. Had the insured squarely objected to fighting and tried to keep out of it, there is no reason to suppose he would have failed of success. Instead of so doing, he provoked his adversary by giv-

ing him the lie, most probably with a profane prefix to the offensive imputation; and, instead of pursuing a pacific policy, he accepted what he must have understood as a challenge to fight.   No doubt he was under the influence of strong passion, but this is no excuse for him in the present litigation.   The fighting was in a public place, that is, a place to which a portion of the public habitually resorted.   It was in a room occupied and used as a saloon and restaurant, in the city of Atlanta.   The fight merely as such was a joint offence and would be classified, under our code, as an affray.   Code, §4515. This is true notwithstanding the evidence indicates none of the blows dealt by the insured took effect, and that the first blow, as well as all others which reached their object, came from his antagonist.   In so far as the constituents of a fight are concerned, the consent of both parties makes the consequent violence of either chargeable to both.   "We think the judge was in error in saying there must be mutual blows to constitute a mutual combat.   There must be a mutual intent to fight.   But we think if this exists, and but one blow be stricken, that the mutual combat exists, even though the first blow kills or disables one of the parties."   *Tate* v. *The State*, 46 *Ga.* 157, 158 (McCAY, J.)   To the like effect is a dictum by Chief Justice Pearson of North Carolina, who says : "Is it necessary that both parties should give and take blows, or is it sufficient that both parties should voluntarily put their bodies in a position to give and take blows, and with that intent ?   To illustrate: Suppose Rippy had not been killed.   Upon an indictment for an affray, would he not have been convicted?   Two men go out to fight.   One is knocked down on the 'first pass,' and that is the end of it.   Are they not *both* guilty of an affray ?   That is, 'a fight by mutual consent.' "   State *v.* Gladden, 73 N. C. 155.   We are no less certain that the fight was a mutual combat, in the legal sense, than

if it had been so found by the verdict of a jury under a full and proper charge from the presiding judge. And the palpable truth that fighting caused the shooting, and therefore the injury, needs confirmation by verdict just as little. The evidence is all one way; but one rational inference is possible. The shooting is accounted for easily and naturally by ascribing it to the fight. This is the proper explanation of it, whether it be regarded as a part of the fight proper, or as a sequel to it. It was certainly embraced within the *res gestæ* of the combat. It took place on the same stage, and within the atmosphere of the antecedent performance. The homicide could well be treated as the culmination of the final scene, the catastrophe of the drama. At the very least, it was a bloody epilogue, and not an independent afterpiece. Nor is it material that it was not down on the bill, but was wholly unexpected by one or both of the actors. Rarely, if ever, can the incidents or the result of a personal encounter be foreseen. A deadly weapon may make its appearance at the last moment, and a homicide be the result, although the fight intended and begun was one with "fist and scull" only. To fight at all is dangerous. When the combative passions are aroused and get a taste of gratification, what momentum they will acquire, and to what extremes it will carry them in their lust for more, is always uncertain. Even friendly wrestling is a door by which anger and a mortal wound may come in. Knowing the hazards attendant on physical competition and contention, this insurance company declined to assume the risk of accidental injury or death caused by fighting or wrestling. The insured might fight if he pleased, but he was not allowed to indulge his combative propensities at the expense of the company; that kind of indulgence was to be at his own risk. Not that the company might not have borne the risk for him if

it had chosen to do so. In the language of Judge Scott, in Harper *v.* Phœnix Ins. Co., 19 Mo. 509 (*supra*) : "Unless it is otherwise stipulated, the insurer takes the subject insured with his flesh and blood and passions; the dangers to which the lives of men are exposed from sudden ebullitions of feeling are a lawful matter of insurance." But in the policy before us the company has "otherwise stipulated." By so doing it has narrowed the range of the policy over the emotions, so as to shut out all those of a pugnacious character. If both combatants contributed to bring on the fight, their relative blame or guilt has nothing to do with the relation of cause and effect between it and the homicide. Nor is it of any moment to consider whether the offence committed in the end was murder or manslaughter. With or without malice, in the technical sense of criminal law, the homicide was caused by the fight, as causation is understood and regarded in the law of contracts. The fight occasioned it, for the fight produced the shooting as a direct and immediate consequence. Who can doubt that the shooting grew out of the fight—sprang from it directly and immediately? Had there been no fight, there would have been no shooting and no killing. It was the fight that excited the homicidal impulse, generated the desire and the purpose to kill. There was nothing else to do it. Even if the slayer was insane or subject to homicidal mania, the mania alone was harmless; it required the superadded excitement of the fight to render it destructive. Had the insured abstained from provoking the fight or accepting a challenge, had he contributed nothing towards bringing on a useless combat, there is no probability whatever that he would have been slain. And he could no more provoke a crazy man, or accept his challenge, at the expense of the insurance company, than he could so deal with a sane man at the company's expense. Indeed, it would

be more hazardous to engage in an affray with a madman than with a rational being; and any reason for protecting the company against the consequences of the less dangerous fighting will apply with increased force to the more dangerous. Injuries caused by rash or needless fighting with any description of combatant are excluded from the scope of the policy.

The nonsuit was properly awarded, and we have stated our reasons very fully for so deciding.

*Judgment affirmed*