# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

### RAILWAY MAIL ASS'N v. MOSELEY et al.

(Circuit Court of Appeals, Sixth Circuit. February 11, 1914.)

#### No. 2382.

1. INSURANCE (§ 668*)—ACTIONS ON POLICIES—QUESTIONS FOR JURY.

In an action on a policy, insuring against sudden or violent death from external causes not the result of the member's own vicious conduct, evidence *held* to make a question for the jury as to whether insured was assaulted by an officer and shot while fleeing to save his life, and hence the direction of a verdict for the insurer was properly denied, even if the insurer would not be liable if insured assaulted the officer and was shot by the officer for the purpose of avenging himself.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. § 668.*]

2. INSURANCE (§ 146*)—CONSTRUCTION—CONSTRUING AGAINST INSURER.

A policy, insuring against sudden violent death from external causes "not the result of the members' own vicious conduct," was ambiguous and susceptible of more than one construction, and should therefore be construed more strongly against the insurer.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 292, 294–298; Dec. Dig. § 146.*]

3. HOMICIDE (§ 105*)—JUSTIFIABLE HOMICIDE—KILLING WHILE MAKING ARREST OR PREVENTING ESCAPE.

Under some circumstances a police officer in whose presence a criminal act is committed may pursue the offender if the offense is a felony, and kill him if he cannot otherwise take him, but he may not kill the offender if the offense is a misdemeanor.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 135; Dec. Dig. § 105.*]

4. INSURANCE (§ 455*)—LIFE INSURANCE—DEATH CAUSED BY VICIOUS CONDUCT.

If the holder of a policy insuring against sudden violent death from external causes not the result of the member's own vicious conduct shot a police officer and fled from arrest and could not be otherwise taken, a killing by the officer while he was so fleeing was justifiable and the direct and proximate result of insured's vicious conduct.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1166–1169; Dec. Dig. § 455.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

211 F.—1

5. INSURANCE (§ 455*)—LIFE INSURANCE—DEATH CAUSED BY VICIOUS CON-
DUCT.

    If the holder of a policy, insuring against sudden violent death from external causes not the result of the member's own vicious conduct, shot a police officer and fled and was pursued by the officer and shot, not for the purpose of arresting him or preventing his escape, but to avenge his own injury, the death was not the direct and proximate result of insured's vicious conduct, and the insurer was liable; and hence the court properly so charged, and properly refused to charge that if insured came to his death by being shot by the officer, whom he had previously shot without provocation, to find for defendant.

    [Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1166–1169; Dec. Dig. § 455.*]

6. TRIAL (§ 255*)—INSTRUCTIONS—NECESSITY OF REQUESTS.

    In an action on a policy, insuring against sudden violent death from external causes not the result of the member's own vicious conduct, where it was not an unnatural implication from the testimony of the officer who shot insured that insured, after firing one shot at the officer, did not attempt to keep up the fight until he had been pursued by the officer for at least 600 feet, the failure of the court to hypothesize the theory of a continued cross-fire and running fight following the first shot, and the theory of self-defense, was not error, where no instructions on these theories were requested.

    [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641; Dec. Dig. § 255.*]

In Error to the District Court of the United States for the Western District of Tennessee; Jno. E. McCall, Judge.

Action by Mollie Moseley and others against the Railway Mail Association. Judgment for plaintiffs, and defendant brings error. Affirmed.

C. L. Marsilliot and Walter C. Chandler, both of Memphis, Tenn., for plaintiff in error.

Bell, Terry & Bell, of Memphis, Tenn., for defendants in error.

Before KNAPPEN and DENISON, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge. This case involves the construction of a clause in a contract of insurance, issued by Railway Mail Association, plaintiff in error, to Emmett F. Moseley, a railway mail clerk at Memphis, Tenn., by which it was agreed, among other things, that if the insured should receive bodily injuries, resulting in death from such injuries alone, within 180 days therefrom, during the continuance of the insurance, through external, violent, and accidental means, the defendant would pay his sisters, the defendants in error, $4,000, less such sum as might have been paid as weekly indemnity during the disability that caused his death.

The clause in question defines accidental death:

"Accidental death shall be construed to be either sudden, violent death from external causes not the result of the members' own vicious conduct, or death within one hundred and eighty days from injuries received by accident alone."

Moseley was a colored man of nearly white complexion. While the insurance was in force, he was shot and instantly killed at Memphis by Burns, a police officer of that city.

To the declaration in the suit below, brought by Moseley's sisters, the defendant interposed the plea:

"That said Emmett Moseley lost his life on or about the 22d day of August, 1911, as the direct and proximate result of his own vicious, violent, and intemperate conduct, in that late in the evening on said date said Emmett Moseley, while committing an unlawful trespass upon private property in the city of Memphis, Tenn., was ordered off of said property in a quiet and peaceable manner by a regularly constituted police officer of the city of Memphis, who was in charge of said property; that said Moseley, being then and there engaged in another violation of the law, to wit, in carrying a concealed, dangerous weapon, a pistol, without any reason or provocation, there and then committed a murderous assault upon said police officer by shooting said police officer with said pistol, whereupon said police officer in defense of his life shot and killed said Moseley, all in express violation of the terms and conditions of the policy sued on in this cause."

The jury brought in a verdict for the plaintiffs in the full amount of the policy and interest, for which judgment was rendered with costs.

The errors assigned, including the refusal of the court to grant defendant's motion made at the close of all of the testimony to instruct the jury to find for the defendant, all relate to the construction put by the court, under the testimony in the case, upon the clause in the contract defining accidental death.

[1] That Moseley's death was sudden and violent from a pistol shot at the hands of Burns was not disputed; and the questions were whether or not Moseley had been guilty of vicious conduct, and, if so, whether or not his death was the direct and proximate result thereof.

Burns testified:

"Well, at five minutes after 9, on August 22, 1911, I went through the Dan Shea Boiler Works, one of my customers or clients, to see that their property was all right, and we have an electric patrol system—an electric box—four boxes located at various points in the building; the first box is on the corner of Washington, and I went to that box first and pulled that box first and went from there to the second, and intended to pull it, and when I got almost to it, I saw a man standing up, and a woman laying down, and I flashed my lamp, and I told them to get out of there, and this woman got up and preceded me; I didn't intend to make any arrest, or anything, but intended to flash on the lamp to show them the way out; I told this man that I was an officer, and if I caught him around there any more, I would arrest him, and when we got out to the road—that is, to the road going to the railroad that is between the office and the boiler shops, why, I heard a shot and felt something strike me in the back, although I felt no pain, although I could feel the blood running down, and this man I had seen a minute before, he ran around to Poplar street depot, and I grabbed my pistol—as soon as I could get it—I grabbed my pistol out and fired a shot at him, and missed him; in the meantime, he ran towards the depot, and I ran after him as quick as I could; I couldn't shoot for the number of railroad men there, and when I got down about on a line with the fourth electric light inside the shed, about midway between Exchange street and Poplar street, I saw this man step behind a coach, and he dropped there, and I ran around the corner of the coach, and he fired another shot at me, and I shot back, and then he ran possibly 50 feet, and I fired a second shot and killed him; in the meantime, I had fallen down between the second and third shots, and I got up

again, and I saw he still held his pistol, and I staggered up to him, and took his pistol away from him, thinking that he might shoot back, and when I got there and took hold of the pistol, I saw he was dead; so I laid down there until the patrol wagon came and got me and carried me to the hospital."

He also said that it was about 100 yards from the boiler works to the south end of the shed, and where he was shot was about 100 feet further south than the north end of the boiler works. If this is true, it would make the distance from where he says he was shot to the place where some of the witnesses first located the two shots at the south end of the shed as much as 400 feet. This is an appreciable distance, even when men are running, and reflects upon the question as to where the first two shots were fired, as well as upon the quality of Burns' conduct. The jury may have found, and could find, from all the evidence in the case, that those shots were actually fired at the south end of the shed, and not at the boiler works at all.

The unfortunate woman referred to denies being present in the boiler works, though she was later arrested in the vicinity, but just how far away is not made clear; and she denies ever having had to do with negroes. Burns alone testifies to Moseley's presence in the boiler works, if, indeed, he was present. It is difficult, from the testimony, to lay with accuracy the scene of the killing, because of the lack of exact location of fixed objects referred to, and their distances from each other. But it may be gathered from the testimony and a map of the city of Memphis (itself lacking in notations of distances) that on the south of the railroad shed spoken of in the testimony, is Poplar street, and to the south of Poplar street the boiler works are located. How wide Poplar street is does not appear. Whether the shed covers the whole distance between Poplar street and the street at the north of the railroad station and the length of the shed do not appear. It may be gathered from the testimony and the briefs of counsel that the distance between the boiler works and the place where Moseley fell dead is about 600 feet; it may be more than that. There was a train of cars standing in the station, the most southerly of which, an express car, was probably midway of the shed.

Moseley lived with his brother and sisters, not far away from the station. How far does not appear. He left home to mail a letter at the station. One of the witnesses talked with him on the subject at the station within a very short time before he was killed. There is substantial agreement among the witnesses that the killing took place between 9 and 10 o'clock, probably not earlier than quarter past 9. There were electric lights in the station. The news was telephoned to Moseley's brother, who testified that Moseley had been away about 45 minutes. Moseley was 21 years of age, and had a good reputation for peacefulness.

The weight of the evidence fixes the firing of the initial two shots at the south end of the station. There was some evidence that the sound of footsteps preceded any shooting. It was substantially proved that Moseley and Burns, the former leading, were running rapidly northwardly in the station. It was established that Burns had a pistol in his hand. Some witnesses say Moseley had a pistol in his hand while running, and others that he did not. Moseley ran past the south

end of the car and at the west of it, there being evidence tending to show that Burns was gaining upon him, and, at a distance of perhaps 15 or 20 steps, shot him; Moseley fell; but regained his feet quickly, at which time Burns was but a few feet from him, and ran back southwardly and around the south end of the car toward the east, "circling around" the end of the car; Burns taking a wider circle, and, with an oath, saying, "I am going to kill you," shot again at Moseley, who fell dead, shot twice in the back.

There is evidence tending to show that Burns himself fell down, or lay down, shouting: "You all seen him shoot me first," and others say he said, "He shot me first."

There is evidence tending to show that at the corner of the car Moseley stopped and shot twice at Burns.

If Moseley lingered at the end of the car to shoot Burns, the length of time he lingered must have been very brief—indeed scarcely appreciable. But it is quite possible, and from all the evidence the jury could have found, that the shooting of Burns occurred at that time and immediately before he killed Moseley. Two pistols were found in front of Burns. Burns was undoubtedly shot, and in the back, but whether the shot came directly from behind, or made a glancing wound in the back, does not appear.

There was evidence tending to show that Burns while pursuing Moseley called out: "Stop that man!"

It would not be practicable to set out all the evidence at length. It is not necessary to do so, because sufficient is shown upon which a number of hypotheses might be based for submission to the jury.

[2] Before considering these in detail it may be said that the meaning of the language in the clause in question is not clear and under the circumstances becomes ambiguous and susceptible of more than one construction. It should therefore be construed more strongly against the insurer. Am. Surety Co. v. Pauly, 170 U. S. 133, 144, 18 Sup. Ct. 552, 42 L. Ed. 977. But, passing this rule of construction as one not involving a vital question in the case, we proceed.

From one aspect of the case the jury might find that Moseley was killed while fleeing from arrest for some offense, whether a misdemeanor or a felony. Strangely enough, Burns does not claim that Moseley was resisting arrest or fleeing to escape arrest, but claims only that he killed Moseley in self-defense.

[3, 4] Under some circumstances, a police officer, in whose presence a criminal act is committed, may pursue the offender fleeing from arrest, and, if the offense is a felony, may kill the offender if he cannot take him otherwise; but he may not kill him if the offense is a misdemeanor. 2 Cooley's Blackstone (3d Ed.) 292; 1 East's Pleas of the Crown, 302; Williams v. State, 44 Ala. 41; Reneau v. State, 2 Lea (70 Tenn.) 720, 31 Am. Rep. 626; Head v. Martin, 85 Ky. 480, 3 S. W. 622; State v. Sigman, 106 N. C. 728, 11 S. E. 520; Thomas v. Kinkead, 55 Ark. 502, 18 S. W. 854, 15 L. R. A. 558, 29 Am. St. Rep. 68. If Moseley was a trespasser on the property of the boiler works, and if he carried a pistol, those offenses may be assumed, under the laws of Tennessee, to be misdemeanors. If Moseley did shoot Burns

in the back at the boiler works, he was guilty of a felony, and if he fled from arrest and could not be overtaken, and was killed by Burns while so fleeing, Burns had the right to kill him if he could not take him otherwise. And such killing would have been the direct and proximate cause of Moseley's vicious conduct. Or if immediately upon being shot, Burns, to save his own life or to save himself from great bodily harm, had then and there killed Moseley, there might be good ground for claiming the necessity of self-defense in taking human life, and so make Moseley's misconduct the direct and proximate cause of his death. Or if Moseley's death occurred in a continuing running fight and cross-fire, his death might be said to have been the proximate result of his own conduct. But the facts necessary to support these defenses were not, to say the least, undisputed; and it cannot be said that there was not room for a conclusion that Burns, pistol in hand, assaulted Moseley, and that the latter thereupon fled to save his life. Therefore, apart from the legal effect of a finding that Burns, after being shot in the back at the boiler works, pursued Moseley, not to arrest him, nor in self-defense, but only for the purpose of avenging himself upon him, it is clear that there was no error in refusing to direct a verdict for defendant.

[5] The hypotheses above mentioned (except those of self-defense and the running fight and cross-fire, which are not involved in the assignments presented) were clearly submitted to the jury in the following language:

"If you believe from this evidence that the assured was assaulted by this police officer, Burns, and then ran, and he pursued him, as the proof shows was done in this case, and shot him, then the plaintiff is entitled to a recovery.

"If you believe from the evidence that this police officer came upon the assured in Shea's warehouse in company with a woman, and he told him to get out, and in going out, the assured shot him in the back, and ran to get out of his way, and Burns followed him with the intention of revenging himself for the shot which had been inflicted upon him, and not for the purpose of arresting Moseley, and shot him, then the plaintiff would be entitled to recovery.

"If, however, you believe from the preponderance of the evidence in this case that this man Burns was a police officer and was attempting to arrest Moseley and the man shot him, and that Burns pursued him for the purpose of arresting him, and in the shed the deceased turned on him and shot at him, and then Burns fired and wounded him, then the company would not be liable, and you should find for the defendant.

"The distinction I am seeking to make is this, so that you may understand it. In the one case, if the colored man shot him in the back, and ran to get out of his way, and this man, Burns, to avenge himself upon him, pursued him, and shot him, then the company is liable, but if the man was attempting to arrest the deceased in the warehouse for the violation of the law, and the negro shot him and ran, and this officer pursued him to arrest him for the law he had violated, and not for shooting him, and the colored man turned upon him and shot him, or shot at him, and the officer then shot him and killed him, plaintiffs cannot recover, because in the latter case he was pursuing his duty as an officer in arresting the man for violation of the law, and if the deceased resisted that, and continued to resist it, while he was trying to arrest him for that violation of the law, then his death would have come about from his own vicious conduct, and he could not recover, whereas, if he shot Burns in the back and ran, and abandoned the difficulty, and was trying to get away, he would not have been killed, except the officer pursued

him and shot him. The officer was not authorized to inflict punishment upon the deceased for having shot him. That is the business of the courts and juries. Under the law, as I interpret it, if Moseley came to his death at the hands of this officer, who was seeking revenge for shooting him, it could not be said that was the result of the vicious conduct of Moseley in the warehouse."

Counsel for the defendant excepted to so much of the charge as instructed the jury that if Moseley shot Burns and ran, and Burns pursued him to avenge his own injury, this would not be vicious conduct within the meaning of the policy, and the plaintiffs might recover. We think this instruction was proper.

Another objection was:

"The defendant objects to that part of the charge of the court which instructs the jury that unless they find from the evidence that the deceased, Emmett Moseley, was killed while resisting arrest, there can be a recovery by the plaintiff."

The court did not so instruct the jury. It is true that the theory of self-defense and the theory of the running fatal fight, both combatants shooting, were not submitted to the jury, but counsel for defendant made no objection to the charge for that reason, nor did he at any time request a charge on those phases of the case. The defendant, therefore, takes nothing by this exception as heretofore shown.

In the motion for a new trial and in the assignments of error is found a claim that the court erred in refusing defendant's special request to charge the jury:

"If you find from the evidence that Emmett Moseley came to his death by being shot by W. F. Burns, whom he had previously shot on the premises of Dan Shea Boiler Works, without provocation on the part of said Burns, then your verdict should be for the defendant."

The record of the trial does not apparently disclose any such request, but if, indeed, it was made, the charge would not have been proper, for it entirely ignores the important consideration that Moseley's misconduct, in order to avoid the policy, must have been the direct and proximate cause of his death.

It is true that Burns is not on trial for murder in this case, yet it was necessary for the jury to consider the quality of his conduct in determining whether or not Moseley met his death as the direct and proximate result of his own vicious conduct, for, if he was murdered by Burns, then, as will appear, his death resulted directly and proximately, not from his own initial wrong, whatever it was, but from the crime of Burns.

If the exemption in this policy had been for accidental death resulting from the negligence of the insured, and it appeared on the trial that while he was negligent, yet the proximate cause of his injury, as recognized in the law, was the negligence of another, it could not be successfully claimed that the injury to the insured resulted from his own negligence. There must be proximation, such as the law recognizes, between cause and effect (or result) before a given effect, or result, may be ascribed to that cause. The defendant recognizes that the "result" the parties to the contract had in mind has the same meaning the law would give it, for in the plea it is averred that Moseley

lost his life "as the direct and proximate result of his own vicious conduct."

If Moseley shot Burns at the boiler works, and Burns in hot blood at the moment instinctively had shot and killed Moseley (which is quite different from pursuing Moseley, and twice shooting him in the back while he was running away), the resulting death might, with some force, be charged to Moseley's conduct as its cause (Murray v. Insurance Co., 96 N. Y. 614, 618, 48 Am. Rep. 658); and, of course, if Burns killed Moseley in self-defense, Moseley's death would, no doubt, have been the proximate result of his own conduct against which Burns must protect himself. Or if death ensued during an exchange of shots in a running fight, it might be said to proximately result from Moseley's conduct. And if Moseley had committed the felony of shooting Burns in the back, and his own death resulted while resisting arrest, no one would doubt that he lost his life as the direct and proximate result of the vicious conduct involved in resisting an officer of the law in the lawful discharge of his duty.

On the other hand, if Moseley had shot Burns in the back and escaped, and Burns, after being in the hospital for two weeks, as he says he was, met Moseley on the street and arrested, or sought to arrest, him, and killed him while he was trying to escape, it could not be said that Moseley's conduct at the boiler works was the cause of his death. In that case, also, the cause would be his resistance to lawful authority. And if in so meeting Burns did not intend to arrest him, or try to arrest him, but drew his pistol and shot him while running away, for the purpose of avenging the injury to himself, all would probably agree that his death was not the direct and proximate result of whatever viciousness he had displayed at the boiler works, but was the result of unjustifiable homicide at Burns' hands.

But when the circumstances make a case which does not fall within either of these extremes, where shall the line be drawn with respect to which it may be said that all cases falling on one side of it are of such character that the cause of death shall be ascribed to the conduct of the insured, and in all cases falling on the other side of it the death shall be charged to the conduct of the one by whose unlawful act the death was in fact brought about? Manifestly, if the killing is the lawful act of the one who does it, the result cannot be ascribed to him as the guilty cause of it; and it is equally true that if the death results from the unlawful conduct of the slayer which was not the natural and reasonably to be expected consequence of the conduct of the one slain, then the slayer's vicious conduct is the guilty cause, and not the conduct of him who is slain, whatever it may have been.

The line, then, must be drawn where the law draws it, and the resulting death must be ascribed to its cause in law, and not to a cause which in itself and of itself does not proximately lead to the fatal result, and is only a condition under which that result happened.

While no case has been cited involving a clause just like the one in question, yet there are a number of cases in which the agreement was that the policy was void if (in substance) the insured should die in the known violation of any law, or in consequence of any unlawful act.

The clauses vary in language, but these two are illustrative of the others.

In these cases the courts were dealing with cause and effect, as we are here; in all of them they were construing contracts in order to ascertain the meaning of the parties; in all of them they were of opinion that "result" means "proximate result," as the law would define it, and in all of them, when the insured has lost his life, no matter how heinous his initial conduct may have been, through the crime of the slayer, the resulting death was ascribed to the unlawful conduct of the slayer as its proximate cause, and the beneficiaries in the policies were permitted to recover.

In Utter v. Insurance Co., 65 Mich. 545, 32 N. W. 812, 8 Am. St. Rep. 913, in which the policy under consideration provided, among other things, that no claim could be made under it when the death happened while the insured was engaged in or in consequence of any unlawful act, it appears that the insured, a minor and deserter from the army, was shot and killed in a house of ill fame by a police officer who, without a warrant and acting under instructions of the undersheriff, went to the place where the deserter was for the purpose of arresting him. There was evidence tending to show (if one of the witnesses who was in the house was to be believed) that the insured was killed in a wanton and murderous manner. The trial judge had directed a verdict for the insurance company. This was held to be error, not only upon the ground upon which the direction was made, but also because the Supreme Court were of opinion that the question whether or not the insured was doing anything unlawful at the time he was killed should have been left to the jury; and the court said (65 Mich. 553, 32 N. W. 815, 8 Am. St. Rep. 913):

"Nor can it be held, as a matter of law, that Utter was engaged in an unlawful act, within the meaning of this policy. If he had been shot in the act of deserting, this claim might be made with some reason and propriety, but such was not the case here. Neither was he shot because he was a deserter, nor because he was in a house of ill fame."

In other words, from one aspect of the case, the cause of his death was not that he was at the time engaged in, or his death resulted as a consequence of, any unlawful act of his, but the cause of it was the unlawful act of the officer in killing him.

The general term of the Supreme Court of New York had before them the case of Goetzman v. Insurance Co., 3 Hun (N. Y.) 515, in which the company was exempted "if the assured shall die by suicide or in consequence of his violation of any law." It appeared that the assured, being caught by one Hesler immediately after having committed adultery with his wife, was shot and killed by him. The court were of opinion that, however great a violation of law and morals the assured's act was, yet that offense had been completed and the assured was about to go away; that the act of Hesler in killing the assured was a crime, and (3 Hun, 518):

"If the assured had been killed a week or a year after the injury, for the same cause, it would have been quite as direct a result thereof as when it was done. In short, the proposition that a man, who has been thus wantonly killed by another, without necessity or lawful excuse, died in consequence of

his own act, is logically contradictory, unless it be admitted that the killing of an adulterer follows his offense in the ordinary sequence of events. That admission we are not prepared to make."

The question put by Chief Justice Hill of the Supreme Court of Arkansas, in Supreme Lodge v. Bradley, 73 Ark. 274, 276, 83 S. W. 1055, 1056 (67 L. R. A. 770, 108 Am. St. Rep. 38, 3 Ann. Cas. 872), which, by their decision, the court answered in the negative, was this:

"Is a death received while retreating from a personal difficulty (and not retreating for the purpose of gaining a vantage ground to renew it), where the rencounter is begun by an assault by the deceased upon his slayer with a weapon capable of inflicting great bodily harm or death, according to its use, a death within the meaning of an insurance clause exempting against liability for a death 'in violation or attempted violation of any criminal law'?"

It appeared that one Bradley entertained ill feeling toward one Morscheimer. They met at the entrance of the courthouse; Morscheimer entering, and Bradley leaving, the building. Words passed; Bradley struck Morscheimer on the ear with a piece of iron. Morscheimer staggered, stepped back a few paces, drew his pistol, and began firing at Bradley. One of the shots, not fatal, struck Bradley in the breast. When Morscheimer began firing, Bradley turned and ran back into the courthouse, and, in attempting to enter the sheriff's office 24 feet away from the place where the affray began, fell into the arms of the sheriff, having received a fatal wound in the back from which he died almost immediately. He received the fatal wound immediately after he had turned and fled. There is much in the opinion of the learned Chief Justice pertinent to the issue here, but what he says about the proximate cause of Bradley's death is especially apt (73 Ark. 278, 83 S. W. 1057, 67 L. R. A. 770, 108 Am. St. Rep. 38, 3 Ann. Cas. 872):

"There must be a line drawn somewhere between consequences proximately, and those remotely, flowing from an unlawful assault; and the safe place to draw that line is where the law draws the line of lawful resistance to the unlawful assault."

And then he proceeds to say that Bradley was fleeing from the conflict, and received his wound in the back while escaping, and that Morscheimer was not legally justified in taking Bradley's life under those circumstances.

"Therefore, the first violation of the law by Bradley was not the proximate cause of his death, but the subsequent unlawful act of Morscheimer in shooting his retreating assailant was the proximate cause."

To the same effect are Harper's Adm'r v. Insurance Co., 19 Mo. 506; Overton v. Insurance Co., 39 Mo. 122, 90 Am. Dec. 455; Cluff v. Insurance Co., 13 Allen (Mass.) 308; Bradley v. Insurance Co., 45 N. Y. 422, 6 Am. Rep. 115; Griffin v. Benevolent Ass'n, 20 Neb. 620, 31 N. W. 122, 57 Am. Rep. 848; and Supreme Lodge v. Crenshaw, 129 Ga. 195, 58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St. Rep. 216, 12 Ann. Cas. 307.

There is a class of cases of which Taliaferro v. Protective Ass'n, 80 Fed. 368, 25 C. C. A. 494, and Casualty Co. v. Stacey's Ex'rs, 143 Fed. 271, 74 C. C. A. 409, 5 L. R. A. (N. S.) 657, 6 Ann. Cas. 955, are

examples in which the insurance was against death by accident. Under the circumstances in these the courts were of opinion that the fatal result to the insured was to be expected from what he did, and was the natural and logical result of an intentional act on his part, and hence could not be regarded as an accident in any sense in which that word has been defined in the books.

In Gresham v. Insurance Co., 87 Ga. 497, 13 S. E. 752, 13 L. R. A. 838, 27 Am. St. Rep. 263, the policy excepted, among other things, accidental injuries caused by fighting, and recovery was denied because the insured was killed while the fight with his slayer was continuing, though from the facts it cannot be said that the slayer was legally justified in what he did.

But that case is distinguished in Supreme Lodge v. Crenshaw, 129 Ga. 195, 58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St. Rep. 216, 12 Ann. Cas. 307, in which the policy provided that if death is caused or superinduced at the hands of justice, or in violation of or attempt to violate any criminal law, the insurer would not be liable for the full amount of the policy. In that case the insured was killed by a husband, either while he was attempting to commit adultery with the wife, or immediately after the act was completed. It was held (129 Ga. 200, 201, 58 S. E. 630, 13 L. R. A. [N. S.] 258, 121 Am. St. Rep. 216, 12 Ann. Cas. 307) that the policy must be given a reasonable construction, and that the liability of the company is not to be discharged—

"unless the violation of the law consisted in an act of which the death of the insured was the reasonable and legitimate consequence. * * * But there must be something in the act itself, independent of other circumstances, which makes the death the reasonable consequence."

And then, referring to Gresham v. Insurance Co., 87 Ga. 497, 13 S. E. 752, 13 L. R. A. 838, 27 Am. St. Rep. 263, the court makes a distinction between a case of death resulting immediately from hot blood engendered by fighting and while the fight is in progress and cases in which the death cannot be immediately ascribed to the unlawful conduct of the insured, however great a provocation that act may have given the slayer, because the death in such cases is not the reasonable, natural, logical, direct, or proximate result of the insured's conduct, but of the wrongdoing of the slayer. The same distinction is made in Murray v. Insurance Co., 96 N. Y. 614, 48 Am. Rep. 658.

It follows that notwithstanding Moseley had previously shot Burns, if, upon so shooting, Moseley ran, abandoned the difficulty, was trying to get away, and the shot by Burns was in the course of a pursuit made only for the purpose of avenging himself upon Moseley, defendant would be liable. The killing of Moseley under such circumstances would not be the direct and proximate result of his misconduct. In such contingency something intervened between the situation in which Moseley's conduct might have been said to have resulted in his death, if he had then been killed, and the situation in which, fleeing for his life, his death resulted from Burns' unlawful purpose to kill. It cannot, we think, properly be said to be matter of reasonable and natural expectation that a police officer, if shot from behind his back by one whom he, as such officer, had just driven or ordered away from certain

premises, would pursue his previous assailant, no longer such, but bent only on saving his life and avoiding further collision, and would follow the fugitive at least 600 feet, not with the design of arresting him, but solely and purely with the design of killing him then and there, by way of revenge.

[6] It is true that the theory of a continued cross-fire and running fight between Burns and Moseley, following the latter's shot at the boiler shop, was not submitted. But in view of the not unnatural implication from Burns' testimony that Moseley did not attempt to keep up the fight after the first shot fired at the boiler shop, until at least after he had been pursued by Burns for at least 600 feet (when Burns says Moseley dropped behind the car and fired again), it was incumbent upon defendant, if it relied upon the defense that Burns' shot was delivered in the course of a running fight or actually in self-defense, to have presented a request embodying that theory. This was not done, and so the situation presented by such theory is not necessarily before us. The rule given by the trial court, confined as it was to the theory stated, is, in our opinion, amply supported by the authorities cited.

We find no error in the charge or in the action of the court in overruling defendant's motion for an instructed verdict.

The judgment of the district court is therefore affirmed, with costs.