| 65 | 545 |
| 111 | 151 |
| 65 | 545 |
| 112 | 430 |

ANN D. UTTER v. THE TRAVELERS' INSURANCE COM-
PANY.

*Accident insurance—Death by design—Construction of policy—Stip-
ulation as to proof required.*

1. Plaintiff sued defendant, as beneficiary, on an accident insurance
policy issued to her son, which provided—

*a*—"That no claim shall be made under the policy when the
death or injury may have happened in consequence of *voluntary*
exposure to *unnecessary* danger, or while the insured was, or in
consequence of his having been, under the influence of intoxi-
cating drinks, or while engaged in or in consequence of any *unlaw-
ful* act."

*b*—" That this insurance shall not be held to extend to disap-
pearances, nor to any case of death or personal injury, unless
the claimant under this policy shall establish, by *direct* and *posi-
tive* proof, that said death or personal injury was caused by *exter-
nal* violence and *accidental* means, and was not the result of
*design*, either on the part of the insured or of any other person."

At the time the policy was written the insured was a minor,
and a deserter from the United States army, and was shot and
killed by a deputy-sheriff in a house of ill fame, where the offi-
cer went to arrest him, without a warrant, assuming to act under
the instructions of the under-sheriff, who had seen a telegram
from the captain of the company to which the insured belonged,
describing him and stating that he was a deserter. The
defendant sought to avoid a recovery on the grounds—

*a*—That the insured was killed while seeking to avoid cap-
ture as such deserter.

*b*—That he was intoxicated at time he received the injury
causing death.

*c*—That his death happened in consequence of his voluntary
exposure to unnecessary danger, and of his unlawful act, in that
he was such deserter, and was shot and killed by an officer
while seeking to avoid capture, etc.

*d*—That he was shot and killed while engaged in an unlawful
act, and in consequence thereof, in that he pointed a pistol at the
officer in a threatening manner, and was shot and killed by such
officer in self-defense.

The testimony was conflicting as to the circumstances of the kill-
ing, that of the defendant *tending* to show that the officer knew the
insured, and demanded his surrender as a deserter, and shot him
in self-defense, while that of the plaintiff *tended* to show that
the shooting was reckless, and that the officer did *not* know the
deceased, nor that he had shot him until after the killing. The

65 MICH.—35.

circuit judge directed a verdict for the defendant, holding that the firing of the pistol was not *accidental*, but *designed* by the officer, and that the policy was not intended to insure against murder or willful killing of any kind, but against ordinary accidental means alone.

*Held*, that the case should have been submitted to the jury; that the *design* mentioned in the policy must be considered a *design* on the part of the officer to *kill* the insured, and if *such* design did not exist when he fired the shot, or if he did not know that the man he was shooting at was the insured, there is nothing in the record to prevent a recovery by the plaintiff.

2. A clause in an accident insurance policy requiring *direct* and *positive* proof that the death or injury insured against was caused by external violence and *accidental* means, and was not the result of *design*, either on the part of the insured or any other person, cannot be allowed to govern the courts, which will not permit the course of justice, upon trials before them, to be stipulated or contracted in such manner as to defeat the ends to be subserved by such trials.    Parties may contract in relation to a *condition precedent* before bringing suit, or in relation to anything going to the remedy, but not to the right of recovery itself.

3. When a stipulation or exception to a policy of insurance, emanating from the insurers, is capable of two meanings, the one is to be adopted most favorable to the insured.    May, Ins. §§ 174, 175 ; Wood, Ins. (2d ed.) §§ 60, 62 ; *Allen v. St. Louis Insurance Co.*, 85 N. Y. 473.

Error to Saginaw.    (Gage, J.)    Argued January 29, 1887. Decided April 28, 1887.

Assumpsit.    Plaintiff brings error.    Reversed.    The facts are stated in the opinion.

*Hanchett & Stark*, for appellant.

*Wisner & Draper*, for defendant.

MORSE, J.    The defendant, on the seventeenth day of September, 1880, in consideration of a premium then paid by him, issued and delivered to William Samuel Utter an accidental insurance policy for the benefit of the plaintiff, who was his mother.    This policy insured said Utter against

death occurring through violent, external, and accidental means, for one year, in the sum of $1,000.

When this insurance was effected, the said Utter was under age, and had before that time enlisted as a musician in the regular army.   March 28, 1880, he deserted the service, while stationed at Fort Verde, Arizona, and went to Los Angeles, California.   He was at the latter place when insured, and at the time of his death, which occurred within the life of the policy, February 12, 1881.

After complying with the requisites of the policy as to proofs of death, and after refusal of payment thereon, the plaintiff brought suit for the recovery of the sum named therein in the circuit court for the county of Saginaw.

The defendant pleaded the general issue, and gave notice under the same that it was provided in the policy as follows:

" 'And no claim shall be made under the policy when the death or injury may have happened in consequence of voluntary exposure to unnecessary danger, or while the insured was, or in consequence of his having been, under the influence of intoxicating drinks, or while engaged in or in consequence of any unlawful act.'

" And said defendant will show and prove, upon the trial of said cause, that William Utter, the insured named in said policy, was a soldier in the army of the United States, and while so engaged, on or about the twenty-eighth day of March, 1880, deserted and fled from his post and command; and while being a deserter, and endeavoring to avoid capture as a deserter, and being returned to the army authorities, and while seeking to escape arrest as a deserter, was shot and killed.

" And said defendant will also show that, at the time said William Utter received the injury which resulted in his death, he was intoxicated; and also that such injury was received in consequence of his having been under the influence of intoxicating drinks.

" And defendant will also show that the death of said William Utter happened in consequence of his voluntary exposure to unnecessary danger, and in consequence of his unlawful act, in that, being a soldier in the army of the United States, he became and was a deserter therefrom on or about the

twenty-eighth day of March, 1880, thereby subjecting himself to pursuit and attempted capture, and the danger and peril attending the same, and thereby being engaged in an unlawful act; and while being such deserter, and while attempting to escape capture, and thus exposing himself to unnecessary danger and peril, and while thus engaged in an unlawful act, the said William Utter was shot and killed by an officer who was endeavoring to arrest him as a deserter, and from whom said Utter was seeking to escape.

"The defendant will also show that the said William Utter was killed while engaged in an unlawful act, and also in consequence of an unlawful act, within the meaning of said policy, in that he did commit an assault upon one J. A. Berry, by pointing directly at him, said Berry, a pistol in a threatening manner, and so as to induce in the mind of said Berry the belief that he intended to fire, and that he, said Berry, was in danger, and thereupon, in consequence of said act of Utter, said Berry shot and killed him."

The policy also contained the following clause, which becomes material in the discussion of the case as it stands in this Court:

"And this insurance shall not be held to extend to disappearances, nor to any case of death or personal injury, unless the claimant under this policy shall establish, by direct and positive proof, that the said death or personal injury was caused by external violence and accidental means, and was not the result of design, either on the part of the insured or of any other person."

Upon the trial, at the close of the testimony, the circuit judge directed a verdict for the defendant. The jury rendered such verdict, and judgment passed thereon for the defendant.

Utter was killed in a house of ill fame in Los Angeles, by a pistol shot fired by one Berry, a deputy-sheriff of Los Angeles county. It seems that the captain of the company to which Utter belonged learned of his whereabouts, and telegraphed to the sheriff a description of Utter, stating that he was a deserter. This telegram was shown to Berry, and he was instructed by the under-sheriff to arrest Utter. Berry,

without any warrant, process, or other authority, went to this house where Utter was, and shot and instantly killed him. The facts as to the killing are conflicting, as stated by the different witnesses.

George Branagan, who testifies on the behalf of the plaintiff, says that Utter, John H. Sheehan, and himself were in the house together, sitting in a room used as a kitchen, talking together. Utter said a policeman was after him. After they had sat there some five or ten minutes some one came to the front door and rapped very loud. The door was locked. There was a door of the kitchen opening out on an alley-way that ran into the street. Some one came and rapped at that door, and then stopped. The noise stopped a little while.

"Perhaps a minute afterwards Utter got up and opened the door. A shot was fired, and he fell. Then one Berry came into the room through the door with his pistol in his hand, pointed the pistol at Sheehan, and told him to throw up his hands; saying to him, 'I believe you are Billy Utter.' Sheehan replied, 'No; you've killed your man.'"

The door through which Utter was shot opened on the inside of the room, and turned on its hinges to the right, so that it was impossible almost for one at the same time to use any weapon.

"The shot was fired as soon as the door was opened wide enough to allow Utter to poke his head around, and look out."

Branagan did not hear anything spoken, either by Berry or Utter at the time. Had anything been said, thinks he would have heard it. Utter was shot in the head. He was not under the influence of intoxicating liquors, and Branagan did not see any revolver in his hand when he was shot.

Berry testified on the part of the defendant that he was deputy-sheriff of Los Angeles county; that on February 12, 1881, he received instructions from the under-sheriff to arrest William Utter. He had no warrant or other writ, and no complaint had been lodged against Utter. Had no authority

except the under-sheriff's instructions, and a telegram he had seen, the substance of which was to arrest Utter, he thinks, for being a deserter.

"That, on receipt of telegram, he asked Jeff. Thompson to go with him. They found Utter in a house of ill fame on Los Angeles street, in Los Angeles, California. Witness looked through the blind into the room, and saw Utter and another man in a room. He then sent Bottelle, a man who was with witness, to arm himself. While he was gone, a woman came out of the house, and ordered witness off. He refused to go, but followed her into the house. When he got to the room where he had seen Utter, there was no one in it. Heard a noise in an adjoining room, and tried to enter that room, but the door was locked. He then heard a noise as of a door opening on the outside, and passed out, and was approaching an outside door, when the door opened, and Utter appeared. Witness told him, in substance,—he cannot remember the exact language,—to throw up his hands; that he (witness) was an officer, and arrested him. The moment that he presented his pistol and spoke to him, Utter stepped back a step, and raised his pistol, pointing it at witness. Witness fired, and Utter fell. The moment the door opened, witness commanded him to throw up his hands, and there was no other conversation. Utter did not speak. Don't know whether his revolver was cocked or not; but considered his action threatening and dangerous. It was between 8 and 9 o'clock in the evening. Branagan and another party were in the house with Utter. I knew Utter by sight. I recognized him when I saw him. I spoke as soon as the door opened, disclosing him."

Three other witnesses, who did not see the shooting, testified that they each came there shortly after, and saw a pistol lying on the floor beside the body of Utter.

The plaintiff also introduced evidence tending to show that Utter was partially deaf, so that his hearing was materially affected; that neither his father nor mother consented to his enlistment, and that the father, at the time of the killing, was engaged in measures to obtain his release from the service.

Upon this testimony, which is here substantially given, the court below based its opinion that "The injury was a pistol-shot

wound, and the firing of the pistol was not accidental," but designed by the firing party, and that the policy was not "intended to insure against murder or willful killing of any kind, but intended to insure against ordinary accidental means alone,—what we properly know as accidents." It is true, as the court below said, that there is no dispute with regard to the fact that the officer intended to shoot, and intended to inflict bodily injury upon some person. The officer deposes that he knew it was Utter when he fired, but the evidence of Branagan tends very strongly to show that he did not know it was Utter he had shot, and, after he came into the room, thought Sheehan was Utter, until informed by Sheehan that he "had killed his man."

It is claimed by the counsel for the plaintiff that the "design" mentioned in the policy must be considered as a design to kill Utter, and that there was evidence in the case sufficient to go to the jury, tending to show that the act that caused the death of Utter was not done with the design of killing him. In other words, if Berry went to the house where Utter was, not with the intention of killing him, but for the purpose of arresting him, and when the door was opened, by reason of Utter's drawing a pistol, or any other cause, he fired, not knowing it was Utter, although the death of Utter was caused thereby, and Berry meant to kill whoever it was, it cannot be held that the death of Utter was caused by design; that, when the design was to kill, it must also be a design to kill Utter, then formed in the mind, and intentionally carried out by the act.

If a person should draw a pistol in a crowded street, and deliberately fire the same, with the intent of killing some one, or with a reckless disregard of human life, and a person was killed or wounded, would such killing or wounding be an accident, in the meaning of this policy, or would it be by the design referred to therein? There would undoubtedly be a design to kill or wound some one, but no design to kill or

wound the particular person injured.  Suppose that, for the purposes of plunder, persons arrange to throw a passenger train off a railroad track, knowing that such act is liable to kill or injure some one, but having no malice against any individual thereon, or any design to kill any particular person, and the train is derailed, and the insured killed, can it be said that his death was not accidental, under this policy, but by the design of some person?

The argument may be carried further.  Suppose one fires a pistol in the air.  He fires by design, but does not intend to kill any one.  The shot strikes the insured, and kills him. The act which causes the death—the shooting of the pistol —is designed, and therefore not accidental, but the killing is certainly accidental, and not designed.  If the pistol is fired at one man, and hits another, is it any less accidental, as far as the person hit is concerned, or the mind of the person who does the shooting?  And, if the shot is fired at the insured in the belief that he is another man, is not the character of the act the same?  If one designedly roll a stone down a mountain side with no intent to injure any one, and in its course it crush a man, it is an accident.  If it were purposely rolled down to crush one man, and it is deflected from the course intended, and it kills another, is it not equally an accident?  The design or purpose was not to kill the one injured, because it was intended to kill another, and not him.  The criminal intent of the one putting the stone in motion may render him guilty, and responsible for the actual result, though not intended; yet the death of the person thus killed must be considered, as far as he is concerned, an accident, as his death was not intended by any one.

It seems to me that the design intended by the terms of this policy must be the design that intended the actual result accomplished, and not the design of the act itself, which act resulted in the killing of one contrary to the design of the act.  If, when Berry fired this shot, he did not know the man

he fired at was Utter, and did not intend to kill Utter, it cannot be said that Utter lost his life by the design of Berry.

Nor can it be held, as a matter of law, that Utter was engaged in an unlawful act, within the meaning of this policy. If he had been shot in the act of deserting, this claim might be made with some reason and propriety, but such was not the case here. Neither was he shot because he was a deserter, nor because he was in a house of ill fame. He was shot, if Berry is to be believed, because he did not throw up his hands when commanded to, and was in the act of drawing a pistol. He was killed, if Branagan is to be believed, without provocation, and in a wanton and murderous manner, as soon as his head appeared in the door. Whether he was doing anything unlawful at the time of the shooting was also a question for the jury, to be determined by them under all the circumstances of the case.

If, on being refused admittance after rapping on the door, the officer had fired through the door, and killed Utter, it could not be claimed that Utter was killed by design, or because he was engaged in any unlawful act; nor if Berry fired at the first head he saw poked out of the door, not knowing or caring who it was, can it be held that the death was by design against Utter, or in consequence of any unlawful act on his part.

The clause in the policy requiring direct and positive proof that the death was caused by external violence and accidental means, and was not the result of design, either on the part of the insured or of any other person, cannot be allowed to govern the courts in cases of this kind. The intent of Berry is locked within his own breast, and can only be determined by his own evidence, or the inferences to be drawn from his acts, which latter would be in the nature of circumstantial proof. If Berry himself had been killed, it would have been impossible, by "direct and positive proof," to show what his real design was, and it would also be manifestly against the

policy of the law, and diametrically opposed to justice, to allow his own testimony of his motives, however unsatisfactory it might be, to be controlling, when all the facts of his actions and language at the time contradicted his positive assertions of his intent upon the trial. If this clause can be allowed to stand, any person accidentally killed, when no one is by, is debarred from the benefit of his insurance. Circumstances may plainly and almost certainly indicate that he was killed by accident, and yet no positive and direct proof can be furnished. If an accident happen upon a railroad by the fault of one of its employés, who is killed by the accident, his design in causing such accident cannot be shown by direct and positive proof, and the beneficiaries of an insured person killed by such accident cannot recover. The design of the person responsible for the killing can in no case be directly and positively proven except by his own evidence or admissions.

Courts will not permit the course of justice, upon trials before them, to be stipulated or contracted in such manner as to defeat the ends to be subserved by such trials. The parties to the contract cannot agree to oust the courts of jurisdiction over such contract. The operation of this clause, requiring direct and positive proof, in many cases would, in effect, preclude the court from jurisdiction and bar a recovery. If they can make this agreement, they can also stipulate that the evidence must come from certain persons, or make any agreement they see fit, controlling and directing the course of proceeding upon the trial. They may contract in relation to a condition precedent before bringing suit, or in relation to anything going to the remedy, but not to the right of recovery itself. Wood, Ins. (2d ed.) § 456, p. 1011. Circumstantial evidence is regarded by the law as competent to prove any given fact; and sometimes it is as cogent and irresistible as direct and positive testimony.

The case should have been submitted to the jury. The

"design" mentioned in the policy must be considered a design on the part of Berry to kill Utter; and if, at the time he fired the pistol shot, he did not intend to kill Utter, or did not know that the man he was shooting was Utter, there is nothing in the present record to prevent a recovery by the plaintiff.

When a stipulation or exception to a policy of insurance, emanating from the insurers, is capable of two meanings, the one is to be adopted which is the most favorable to the insured. May, Ins. §§ 174, 175; Wood, Ins. (2d ed.) §§ 60, 62; *Allen v. St. Louis Insurance Co.*, 85 N. Y. 473.

There was evidence in the case having a tendency to show that Berry did not intend to kill Utter, and did not know that the person he had killed was Utter until after the shooting.

The judgment, therefore, in my opinion, should be reversed, and a new trial granted, with costs of this Court to plaintiff.

The other Justices concurred.