### WILLIAMS v. SOUTHERN SURETY CO.

1. WORDS AND PHRASES—"CHRONIC" DISEASES—DEFINITION.

    In order to distinguish a disease as "chronic," it is necessary that it should have been of long standing, as applied to diseases of a body; that it be deep seated and obstinate, threatening a long continuance.

2. INSURANCE—SICK BENEFITS—CONTRACTS—CONSTRUCTION—RULE.

    Where the terms of an accident and sick benefit policy, issued before the passage of the statute requiring the Standard form of policy to be used, were limited by certain provisions printed in fine print in the application, of which the insured apparently was ignorant, and was depending upon the terms of the policy, on a suit to recover upon the policy, the rule applicable in the construction of the same requires that it should be construed most strongly against the insurer, which prepared the contract, conceding that the policy and application should be construed together as one contract.

3. SAME—"CHRONIC" DISEASE—CONSTRUCTION OF POLICY.

    A provision in the policy that "the total length of time to be paid for during any one illness shall not exceed one year," *held*, to indicate that an illness of four months was not contemplated to be "chronic" within the terms of the policy relieving the insurer from liability.

Error to Kent; Brown (William B.), J.    Submitted June 8, 1920.    (Docket No. 1.)    Decided September 30, 1920.

Assumpsit in justice's court by George R. Williams against the Southern Surety Company on a policy of insurance.    There was judgment for plaintiff and defendant appealed to the circuit court.    Plaintiff died and the action was revived in the name of Anna T. Williams, administratrix.    Judgment for defendant. Plaintiff brings error.    Reversed..

*Charles G. Turner,* for appellant.

*Jewell & Smith,* for appellee.

MOORE, C. J.    George R. Williams became a member of the Phoenix Accident and Sick Benefit Association of Benton Harbor, Michigan, on the 4th day of February, 1898.    For the following 20 years he paid premiums on his policy of insurance.    He began suit on the 8th day of February, 1919, to recover for sick benefits from September 26, 1918, to February 8, 1919, at $40 a month.    The policy issued by the Phoenix Accident and Sick Benefit Association was taken over by the defendant who assumed all liabilities on said policy.    The case was begun in justice's court and appealed by said defendant to the circuit court where it was tried by the circuit judge without a jury, who rendered judgment in favor of the defendant for the reason that he thought the proofs disclosed that the disease with which Mr. Williams was afflicted was chronic and came within the exceptions mentioned in the application.

Mr. Williams died April, 1919, and his widow, Anna T. Williams, was appointed administratrix of his estate and the case was revived according to the rules. The trial judge made findings of fact and law.

Amendments to his findings were duly filed, proper exceptions were taken and the case is here by writ of error.

The policy reads in part as follows:

"In consideration of the covenants, agreements and warranties contained in the application for membership, bearing even number herewith, which application, together with the by-laws of this association, is hereby made a part of this contract and the payment of one dollar in advance on or before the first day of each and every month during the continuance of this policy, the Phoenix Accident and Sick Benefit Association accepts as a member George R. Williams * * * said member shall be entitled to the following benefits, during the time this policy is maintained in full force and effect. * * *

"Forty dollars per month or at that rate for any part of a month after membership of without delinquency prior to the beginning of sickness, should the member become sick from any disease not caused by narcotics, intoxicants, excesses or immoral actions on his part, and be wholly incapacitated from transacting any and every kind of work or business pertaining to his occupation, and as a result thereof be entirely confined to the house or bed. And under the charge of some regularly qualified and registered physician, after the first five days from the time he is so confined to the house. Provided the total length of time to be paid for during any one illness shall not exceed one year. * * *

"In addition to the above will pay for sickness caused by any of the following diseases:"

Then follows the names of 40 diseases, including inflammation of the lungs, the section concluding with the words "And all other diseases not specifically prohibited."

The application for membership reads in part as follows:

"Having carefully examined the principles, objects, classifications and policy of the Phoenix Accident and Sick Benefit Association, I hereby make application for membership, and agree to pay the monthly dues."

Then follow 26 questions and answers.

Between the 12th and 13th questions there are interjected in very small type various provisions, agreements and exceptions, the existence of which it is stated shall avoid the policy.   We quote:

"I, the applicant, do hereby agree that this application and all statements, answers and agreements herein contained, together with the constitution and by-laws of this association, with all amendments heretofore, or hereafter made, are hereby made part of any policy that may be issued hereon."

The words printed between those two answers cover a page and a half of the printed record.   Among them is the following:

"And I further understand and agree that the benefits of membership in this association shall not extend to nor cover disability or death resulting wholly or partly, directly or indirectly, from any of the causes restricted in the by-laws of this association, nor from any of the following causes, viz.: Any disease commencing or existing, or the cause of which existed or commenced at or prior to the date of beginning of membership, in this association."

And then follows a long list of causes which will relieve the company from liability, among them all chronic diseases.

We again quote:

"I, the applicant, here hereby warrant that all statements, answers and agreements herein contained on both sides of this application, whether printed or written by me, or any other person, are my answers; and I understand and agree that the person soliciting or taking this application is my agent as to all statements, answers and agreements contained in application; that no statements or agreements made or received by any person, or to the association, shall be binding upon said association, unless said statements or agreements are embodied in this application in writing.   *   *   *
I hereby expressly waive all provisions of law now existing, or that may hereafter exist, preventing any

physician who has attended me or who may attend me hereafter, from disclosing all information which he may hereby acquire."

Counsel for the appellee say in their brief:

"This policy was issued before the passage of the standard provision law requiring the application to be printed on the policy in order for the defendant to use the provisions of the application as a defense."

It was, probably, contracts like the one before us which led the legislature to provide that policies shall be plainly printed in type not smaller than long primer and that the exceptions to the liability created by the policy shall be printed with the same prominence as the benefits to which such exceptions apply.    See 2 Comp. Laws 1915, § 9371.

It is also probable that it was contracts of a similar character which the supreme court of New Hampshire had in mind when it rendered the opinion in *De Lancey* v. *Insurance Co.*, 52 N. H. 581.    In explaining the nature of the mischief intended to be remedied by the legislature of that State in 1855, the opinion reads in part as follows:

"The principal act of precaution was to guard the company against liability for losses.    Forms of applications and policies (like those used in this case), of a most complicated and elaborate structure, were prepared, and filled with covenants, exceptions, stipulations, provisos, rules, regulations and conditions, rendering the policy void in a great number of contingencies.    These provisions were of such bulk and character that they would not be understood by men in general, even if subjected to a careful and laborious study: by men in general they were sure not to be studied at all.    The study of them was rendered particularly unattractive, by a profuse intermixture of discourses on subjects in which a premium payer would have no interest.    The compound, if read by him would unless he were an extraordinary man, be an inexplicable riddle, a mere flood of darkness and confusion.    Some of the most material stipula-

tions were concealed in a mass of rubbish, on the back side of the policy and the following page, where few would expect to find anything more than a dull appendix and where scarcely any one would think of looking for information so important as that the company claimed a special exemption from the operation of the general law of the land relating to the only business in which the company professed to be engaged. As if it were feared that, notwithstanding these discouraging circumstances, some extremely eccentric person might attempt to examine and understand the meaning of the involved and intricate net in which he was to be entangled, it was printed in small type, and in lines so long and so crowded that the perusal of it was made physically difficult, painful and injurious. Seldom has the art of typography been so successfully diverted from the diffusion of knowledge to the suppression of it. There was ground for the premium payer to argue that the print alone was evidence, competent to be submitted to a jury, of a fraudulent plot. It was not a little remarkable that a method of doing business not designed to impose upon, mislead and deceive him by hiding the truth, practically concealing and misrepresenting the facts, and depriving him of all knowledge of what he was concerned to know, should happen to be so admirably adapted to that purpose. As a contrivance for keeping out of sight the dangers created by the agents of the nominal corporation, the system displayed a degree of cultivated ingenuity, which if it had been exercised in any useful calling, would have merited the strongest commendation. * * *

"When a premium payer met with a loss and called for the payment promised in the policy which he had accepted upon the most zealous solicitation, he was surprised to find that the voluminous, unread, and unexplained papers had been so printed at headquarters, and so filled out by the agents of the company, as to show that he had applied for the policy. This, however, was the least of his surprises. He was informed that he had not only obtained the policy on his own application, but had obtained it by a series of representations (of which he had not the slightest conception), and had solemnly bound himself by a general assort-

211—Mich.—29.

ment of covenants and warranties (of which he was unconscious), the number of which was equaled only by their variety, and the variety of which was equaled only by their supposed capacity to defeat every claim that could be made upon the company for the performance of its part of the contract.    *    *    *

"With increased experience came a constant expansion of precautionary measures on the part of the companies. When the court held (*Marshall* v. *Insurance Co.*, 27 N. H. 157: *Campbell* v. *Insurance Co.*, 37 N. H. 35; *Clark* v. *Insurance Co.*, 40 N. H. 333), that the agent's knowledge of facts not stated in the application was the company's knowledge, and that an unintentional omission or misrepresentation of facts known to the company would not invalidate the policy, the companies, by their agents, issued new editions of applications and policies, containing additional stipulations to the effect that their agents were not their agents, but were agents of the premium payers; that the latter were alone responsible for the correctness of the applications; and that the companies were not bound by any knowledge, statements, or acts of any agent, not contained in the application."

In the fourth edition of May on Insurance, at section 174, it is said:

"Having indemnity for its object, the contract is to be construed liberally to that end, and it is presumably the intention of the insurer that the insured shall understand that in case of loss he is to be protected to the full extent which any fair interpretation will give. The spirit of the rule is, that where two interpretations equally fair may be given, that which gives the greater indemnity shall prevail. And to the same spirit is due the rule that conditions and provisos will be strictly construed against the insurers because they have for their object to limit the scope and defeat the purpose of the principal contract; and apparently contradictory clauses will be so construed if possible as to reconcile them with each other, and to give to each its due force in furtherance of the main purpose of the contract."

In *Grand Rapids, etc., Power Co.* v. *Casualty Co.*, 111 Mich. 148, it is said in part:

"In *Anderson* v. *Fitzgerald,* 4 H. L. Cas. 484, in speaking of the policy in that case, it was said:

" 'It ought to be framed with such deliberate care that no form of expression by which, on the one hand, the party assured can be caught, or by which, on the other, the company can be cheated shall be found upon the face of it.'

"In *National Bank* v. *Insurance Co.,* 95 U. S. 673, speaking of the policy in that case and the rule here stated, the court said:

" 'The company cannot justly complain of such rule. Its attorneys, officers, or agents prepared the policy for the purpose, we shall assume, both of protecting the company against fraud, and of securing the rights of the assured under a valid contract of insurance. It is its language ·which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself.' "

In *Turner* v. *Casualty Co.,* 112 Mich. 425 (38 L. R. A. 529), Chief Justice LONG, speaking for the court, said in part:

"As was said in *Bonenfant* v. *Insurance Co.,* 76 Mich. 657:

" 'Forfeiture is not favored either in law or equity, and a provision for it in a contract will be strictly construed; and courts. will find a waiver of it upon slight evidence when the equity of the claim is, under the contract, in favor of the assured.'

"See, also, *Lyon* v. *Insurance Co.,* 55 Mich. 146 (54 Am. Rep. 354), and cases there cited; *Peoria, etc., Ins. Co.* v. *Hall,* 12 Mich. 202; 2 May, Ins., § 488; *German Fire Ins. Co.* v. *Carrow,* 21 Ill. App. 631; *Thompson* v. *Insurance Co.,* 136 U. S. 287 (10 Sup. Ct. Rep. 1019). * * *

"If this language in the policy is ambiguous and susceptible of two constructions, then the question must be solved in favor of the insured; for it is well settled in this State that where a stipulation or exception to a policy, emanating from the insurer, is capable of two meanings, the one is to be adopted which is the most favorable to the insured; that it ought to be framed with such deliberate care that no form of expression by which, on the one hand, the party insured can be

caught, or by which, on the other, the company can
be cheated, should be found on the face of it.   *Utter* v.
*Insurance Co.*, 65 Mich. 545 (8 Am. St. Rep. 913) ;
*Grand Rapids, etc., Power Co.* v. *Casualty Co.*, 111
Mich. 148."

See *Utter* v. *Insurance Co.*, 65 Mich. 555; *Laker* v.
*Fraternal Union*, 95 Mo. App. 353 (75 S. W. 705) ;
*Northwestern Mutual Life Ins. Co.* v. *Hazelett*, 105
Ind. 215 (4 N. E. 582) ; *Allen* v. *Insurance Co.*, 85
N. Y. at p. 477; *Zantow* v. *Insurance Co.*, 103 Neb. 685
(173 N. W. 694) ; *Teutonia Fire Ins. Co.* v. *Mund*, 102
Pa. St. 94; *Wadsworth* v. *Tradesman's Co.*, 132 N. Y.
540 (29 N. E. 1104) ; *Miller* v. *Insurance Co.*, 31 Iowa,
216; *Moulor* v. *Insurance Co.*, 111 U. S. 342 (4 Sup. Ct.
Rep. 466).

In Volume 2, Words and Phrases, at page 1151, it
is said:

"Chronic. In order to distinguish a disease as
'chronic' it is necessary that it should have been of
long standing as applied to diseases of a body.
'Chronic' and 'acute' are the antitheses of each other.
An acute disease is one usually attended with violent
symptoms, while a chronic disease is deep-seated and
obstinate, threatening a long continuance.   *Jones* v.
*Yarborough*, 2 Ala. 524, 525."

In the instant case it is not probable that Mr. Wil-
liams had any knowledge of what was contained in the
fine print between questions 12 and 13 in the applica-
tion, but if it be conceded that the application and the
policy are to be regarded as one contract, if we apply
the rule of law to be deduced from the authorities we
have cited to the instant case, what must be the re-
sult?  For more than 20 years Mr. Williams had been
proceeding upon the theory that he had a policy that
would entitle him to $40 a month if he became sick
from any disease not caused by narcotics, intoxicants,
excesses or immoral actions on his part.   It is clear
from the evidence that he was sick and that his disease

was not caused by narcotics, intoxicants, excesses or immoral actions on his part. After he had been sick for a time he applied to the agent of the defendant company for money. He was told there was no liability and one gets the impression from reading the testimony of the agent that it was because the agent thought at first that he was not sick enough to entitle him to pay. It is now claimed that because he got worse, and his illness continued till his death, that therefore his illness must have been a chronic illness and there can be no recovery.

We have already quoted a definition of chronic illness. This suit was commenced in justice's court before Mr. Williams died, to recover for four months of illness which he had suffered up to that time. The policy upon its face states "Provided the total length of time to be paid for during any one illness shall not exceed one year." This is a pretty fair indication that no one supposed that when a disease had run but four months that it had reached such chronic stage that there was no liability. Under the undisputed record the plaintiff should have had a judgment for the full amount of $160 and interest.

The judgment is reversed and a new trial is ordered, with costs to the plaintiff.

BROOKE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred with MOORE, C. J.

STONE, J. I concur in the result on the ground that the contract is ambiguous and the provision in the policy should prevail over that in the application.

STEERE, J., concurred with STONE, J.