## KRAVAT et al. v. INDEMNITY INS. CO. OF NORTH AMERICA.

### No. 10024.

Circuit Court of Appeals, Sixth Circuit.

Dec. 3, 1945.

Larry S. Davidow, of Detroit, Mich. (Davidow & Davidow, of Detroit, Mich., on the brief), for appellants.

Benedict H. Lee, of Detroit, Mich. (Kerr, Lacey & Scroggie and Wilfrid C. Dilworth, all of Detroit, Mich., on the brief), for appellee.

Before SIMONS and MARTIN, Circuit Judges, and RAYMOND, District Judge.

MARTIN, Circuit Judge.

On an appropriate allegation of diversity of citizenship of the parties, Leo Kravat and Bert Wilkinson, copartners doing business as Ace Painting Company, brought suit in the United States District Court against their insurer, the Indemnity Insurance Company of North America, under a contractor's liability insurance policy, for reimbursement in the amount of a Michigan state court judgment rendered against them in a tort action. They prayed recovery, also, of their proper costs. Upon the trial of the case, when the plaintiffs rested, the defendant, without offering any evidence, made a motion for a directed verdict of no cause of action. This motion was granted.

The controlling issue presented on this appeal is whether, in the circumstances of the case, the District Court erred in holding as a matter of law that the insured painting firm discharged the insurance company from liability on the policy, by failing to comply with the policy provision requiring "prompt written notice" of the accident for which the partnership was held liable in the state court. The pertinent provision of the policy reads: "In the event of accident, the assured shall give prompt written notice thereof to the company or to one of its duly authorized agents and forward to the company forthwith after receipt thereof every process, pleading or paper of any kind relating to any and all claims, suits or proceedings."

Clauses in liability insurance policies requiring immediate or prompt notice of ac-

cident, claim, or suit, to be given by the insured to the insurer have been prolific of litigation. Elaborate collation of the authorities pertaining to the subject may be found in the Annotated Note in 76 American Law Reports, pages 23-237. Of especial interest here is that portion of the Annotated Note which commences on page 46 and continues to page 128. See also Supplemental Annotation to the Note in 123 American Law Reports, pages 950, 958, 959 et seq.

■ The law of Michigan, however, controls decision in the instant case. The public policy of that state, in relation to the subject matter, has been manifested in its Public Acts. Michigan Statutes Annotated, Vol. 17, Sec. 24.296, C.L. '29, Sec. 12460, contains a provision that failure to give any notice required to be given by the terms of a policy of insurance, within the time specified therein, shall not invalidate any claim made by the insured "if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible."

■ The doctrine of the Michigan courts has been formulated in full cognizance of general jurisprudence. In Michigan, as elsewhere, it has been declared that the agreement to give notice to the insurer must be reasonably construed. Burroughs Adding Machine Co. v. General Accident Fire & Life Assurance Corporation, 258 Mich. 491, 496, 243 N.W. 35. In that case, a liability insurance policy embraced a strong provision requiring the insured to give the insurer immediate written notice of an accident. Failure to give notice until an action was brought against the insured for death by wrongful act two years after the date of the accident was excused, where the tort action was shown to have been groundless and brought against the insured for the fault of a person not in its employ. The insured was allowed recovery from the insurance company of its attorneys' fees and expenses in defending the action.

In Grand Rapids Electric Light & Power Co. v. Fidelity & Casualty Co., 111 Mich. 148, 69 N.W. 249, a judgment based on a holding that the insured was not required to give immediate notice to the insurance company upon the occurrence of an accident was affirmed in a suit on a differently worded policy from that in the case at bar. Immediate notice was there required by the terms of the policy "upon the occurrence of an accident, and upon notice of any claim on account of an accident." The Michigan court quoted the language of its earlier opinion in Utter v. Traveler's Insurance Co., 65 Mich. 545, 555, 32 N.W. 812, 8 Am.St.Rep. 913: "When a stipulation or exception to a policy of insurance emanating from the insurers is capable of two meanings, the one is to be adopted which is the most favorable to the insured."

Rogers v. Great Northern Life Ins. Co., 284 Mich. 660, 279 N.W. 906, was another case in which failure of the assured to give immediate notice of an accident, as required by the policy, was excused and recovery allowed against the insurer. Cf. Phillips v. United States Benevolent Society, 120 Mich. 142, 147, 79 N.W. 1.

On the peculiar facts of Sweeney v. Travelers' Insurance Company, 199 Mich. 584, 165 N.W. 775, a delay of more than six months in giving notice of an accident under a policy requiring "immediate written notice" was ruled too long, as a matter of law, and recovery on the policy was denied. Cf. Hummer v. Midland Casualty Co., 181 Mich. 386, 148 N.W. 413.

In the case at bar, the District Judge, in directing a verdict for the defendant, pursued the praiseworthy practice of stating to the jurors his reasons for taking the case from their hands. In his commentary to them, he cited as authorities for his action: Riley v. Berry Brothers Paint Co., 293 Mich. 500, 292 N.W. 469; and Wisconsin Michigan Power Co. v. General Casualty & Surety Co., 252 Mich. 331, 233 N.W. 333, 76 A.L.R. 1.

In the Riley case, supra, an employee petitioned for compensation under the occupational disease amendment to the Workmen's Compensation Act of Michigan, which provided that hernia would be compensable when "clearly recent in origin and resulting from a strain, arising out of and in the course of employment and promptly reported to the employer." The employee, engaged in lifting forty-pound buckets of paint, had noticed a lump in his groin and, the next day, had observed a swelling which he thought might be a rupture. Upon consulting a physician a day later, he was advised that he had a hernia. He began wearing a truss one week after this diagnosis and, thus fortified, continued to do his regular work until he was laid

off two months after he had first noticed the lump in his groin. He, then, for the first time notified his employer of the hernia. The State Supreme Court held that such notice failed to comply with the mandatory provision of the statute as to prompt notice.

The second case to which the District Judge made reference, Wisconsin Michigan Power Co. v. General Casualty & Surety Co., supra, also stemmed from the Workmen's Compensation Act of Michigan. The failure of the employer, protected by a standard workmen's compensation policy, to give the insurer, as required by the policy, immediate notice of an accident to an employee of which the employer had knowledge, was there held to be a substantial breach of contract, releasing the insurer. In its opinion, the Supreme Court of Michigan pointed to the authority of Oakland Motor Co. v. American Fidelity Co., 190 Mich. 74, 155 N.W. 729, in which more than three months' delay in notifying an automobile liability insurance company of an accident covered by its policy was held, as a matter of law, to be unreasonable, where the policy provided for immediate written notice. The facts were undisputed, and no reasonable excuse for failure to give notice of the accident was presented. Indeed, it was known to the insured "through such ominous sources as the husband of the injured party and the attorney he had consulted" that a claim for damages would probably ensue.

In Michigan, as well as in other jurisdictions generally, in interpreting clauses of insurance contracts requiring immediate or prompt written notice of an accident, the courts have construed such clauses to mean that notice must be given within a reasonable time; and whether notice has been so given depends upon all the facts and circumstances of the particular case. No hard and fast rule seems to have been laid down by the Michigan courts. With characteristic clarity, the great law lecturer, textbook writer and jurist, Thomas M. Cooley of Michigan, wrote in his Briefs on Insurance: "The question as to what would be a reasonable time under the varying circumstances of each particular case would seem primarily to be a question for the jury under proper instructions by the court." Briefs on Insurance, 1st Ed. Vol. 4, p. 3575; 2d Ed. Vol. 7, p. 6088.

In McGrath v. Hargraves, 310 Mich. 510, 512, 17 N.W.2d 733, 734, this statement was made: "It is the unvarying rule in this State that, in passing on a motion for a directed verdict at any stage of a case, the court must consider the evidence in the light most favorable to the party against whom the direction is sought and assume the same to be true." Again, the highest court in Michigan said that, on the motion of a defendant for a directed verdict, the testimony of the plaintiff "and the legitimate inferences to be drawn from established facts must be viewed most favorably to plaintiff." McDuffie v. Root, 300 Mich. 286, 292, 1 N.W.2d 544, 546. See also Fisher v. Grand Trunk Western Railroad Co., 306 Mich. 95, 98, 10 N.W.2d 321.

Bearing these principles in mind, we come now to a discussion of the circumstances of the case. From the facts disclosed by the record, we must determine whether the District Court erred in directing a verdict for the appellee insurance company.

The appellants, Kravat and Wilkinson, were experienced painters, the former having been engaged in that occupation for forty and the latter for twenty-three years. In the early spring of 1940, this firm became subcontractors for the painting of Schmidt Brewing Company's bottle shop building in Detroit, Michigan, under the George W. Auch Company as principal contractor for the construction of the building.

In the contract between the general contractor, George W. Auch Company, and the owner of the building, it was provided that the contractor should take all necessary precautions for the safety of employees on the work; and should comply with all applicable provisions of federal, state and municipal safety laws and building codes, to prevent accidents or injury to persons on, about, or adjacent to, the premises "where the work is being performed." It was further provided that the principal contractor should erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workmen and the public, and should post danger signs warning against the hazards created by such features of construction as protruding nails, hod hoists, well holes, elevator hatchways, scaffolding, window openings, stairways and falling materials. The contractor was also required to designate a responsible member of his organi-

zation to perform the duty of preventing accidents.

The general contract provided further that the contractor should maintain such insurance as would protect him from claims under workmen's compensation acts and from any other claims for damages for personal injury, including death, which might arise from operations under the contract, *whether such operations were conducted by himself, or by any subcontractor, or by anyone directly or indirectly employed by either of them.*

There was testimony that the paint job was commenced on Monday, April 22nd, at which time Kravat, with two other painters, worked in the basement of the building for a short time in the morning. They soon quit, because the basement was not quite ready for their use. That afternoon, they started working on the first floor, which consisted of one large room, fifty by two hundred feet in area. In the floor of this room were six holes, five feet long by two feet wide, spaced at regular intervals some fifteen feet apart. Around each of these holes was a curbing about eight inches high and four inches thick. These holes had been left in the floor for the installation later of conveyors to the basement.

Kravat testified that before he and his men began to paint the room they laid down fifteen-by-twenty-foot canvas cloths, of very heavy material, to protect the terrazzo-like floors. Each canvas was so laid that its edges covered the curbing around the holes and dropped down into them about three or four inches. "To cover the space at the ends of the holes," he said, "we would either use some smaller pieces we had, or else pull the canvas around the corners and together in the center of the ends."

The witness stated further that, at 4:30 P. M., on Monday, April 22nd, his men picked up all the canvas and left the job. They piled the canvas in a corner and when they left the floor was clear of any covering and the holes were still open. At 8:00 A. M., on April 23rd, they went back on the job, and started to lay the canvas again. At this time the holes were still open and uncovered. In about fifteen minutes, they had covered one-fifth of the floor space with canvas, in precisely the same manner as above described. At that time there were eight or ten other men working in and walking through the room, some

of whom were employees of the general contractor, and others of the Schmidt Brewing Company. According to Kravat, the only lighting of this room came through the windows, but the day was bright and clear and there were windows on three sides of the building, making visibility good.

Kravat testified further that, at about 8:15 on the morning of April 23rd while he was standing near the center of the room, one of his painters told him that someone had just fallen through a hole in the floor. Looking down into the hole pointed out to him, he saw Mike Valencia, an employee of the general contractor, lying on top of some plumbing pipes on the basement floor, which was some twelve feet below the first floor. No equipment was lying around this hole, and the floor space was clear of everything except the canvas which had been laid around the hole. The witness did not know whether the canvas had been laid all around the hole or not; but he stated that the hole itself was plainly visible to anyone walking about the room and that "the only way in which a man could fall into it would be for him to be looking in some other direction and walk into it or else stumble and fall into it." Shortly after the accident, the general contractor had two of his carpenters board up all the holes.

In his signed statement, given the indemnity insurance company after suit had been instituted against him and his partner, Kravat said: "It never occurred to me that I would be held responsible in any way for this accident because of the fact that I had nothing to do with the construction of the holes or the building, nor did I have any control over the men working there, except my own, and this was not one of my own men. Nor was I given any instructions or orders to cover these holes any further than to see that the curbing around the edges was protected from paint. Therefore I was completely unsuspecting of any action against me until suit papers were served at our office on July 23, 1940 [three months after the date of the accident], naming Mr. Wilkinson and me as defendants to an action by this man [Mike Valencia] who fell through the hole."

In the trial, Kravat testified that, immediately after he went down into the basement to see what had happened to Valencia, the architect, Reed, representing the

340

owner of the building, assured him that the general contractor, the Auch Company, through its insurance company, would take care of the compensation to the injured man.

The summons in the action brought by Valencia against the partnership was not served on Kravat's partner, Wilkinson, until after six o'clock in the afternoon of July 23rd; and, "the very next day," he took it down to the office of the appellee insurance company in Detroit, after first calling the agent who issued the policy and notifying him of the suit. Inasmuch as Wilkinson was not on the scene when the accident occurred and did not arrive until several hours later, his testimony concerning the situation when he arrived need not be detailed. According to his testimony, the architect stated at that time that "the Auch Company was taking care of the man under their compensation policy with the Lumbermans' Mutual."

Harry Arthur Reid, construction engineer, was assigned as representative of both the owner and the architect to supervise the construction of the bottling works for the Schmidt Brewing Company. He took the stand in behalf of the plaintiffs, and gave strong testimony for them. He stated that Frank Dowd, direct representative of the Auch Company on the construction job, reported the accident to him when he arrived at his office around 8:30 A. M., which was some fifteen minutes after the occurrence. He and Dowd went to the scene of the accident and questioned the workmen about it. It being the architect's duty to protect the owner, Reid asked Dowd whether his concern was "taking care of" the accident, and received the response that it was, through its insurance company.

For further protection of the owner, the architect phoned Fred Auch, head of the principal contracting company, and was definitely assured that the latter was taking care of the accident through its insurance company. Reid testified further that, around 9:30 A. M., he told Kravat, who was directing the painters on the first floor, that both Fred Auch and his direct representative on the job, Dowd, had told him that "the general contractor had taken responsibility" for the accident; and that, when the other partner, Wilkinson, arrived at the building around noon, he gave him the same assurance. He said, moreover, that he told Wilkinson that the general contractor was taking care of the injured

man *through its insurance company*. The witness stated that, even after he had assured Kravat that he had no responsibility, as the accident would be protected by the insurance carried by the Auch Company, and that Fred Auch was "taking care of everything," Kravat said: "It's the man that I am worried about."

We deem it unnecessary to resolve the debate between counsel as to whether the District Court should have received in evidence the entire Exhibit 5 offered by plaintiff, constituting Valencia's hospital record, notations at the bottom of which were excluded by the trial court. Had the whole exhibit been admitted, it would have had no material bearing upon the issue presented for decision.

█ When all the evidence had been received, the trial judge declared that the proof had established that the plaintiffs were informed and believed that either the principal contractor or the insurance company carrying its liability insurance "was going to take care of" Mike Valencia; and that such belief remained in their minds until the action against them was filed. This being true, we think that, in all the circumstances of the case which had been narrated, the question whether under the evidence the appellants gave reasonably prompt notice of the accident, for which they were held liable in the state court, should have been submitted to the jury under appropriate instructions.

The judgment of the District Court is reversed, and the case is remanded for a new trial.